ECS, Inc.; ECS Underwriting, Inc.; Jim Fowler, senior vice president of ECS Underwriting, Inc.; and Frank Longo (hereinafter collectively referred to as "ECS") appeal from an order denying their motion to compel arbitration of a dispute between ECS and Goff Group, Inc. ("Goff"). We reverse and remand.
This dispute arose out of the termination of a "Program Manager's Agreement" ("the agreement") executed in the spring of 2001 by Goff, Greenwich Insurance Company ("Greenwich"), and XL Specialty Insurance Company ("XL"). As "manager" under the agreement, Goff had authority to bind "insurance policies for insureds introduced to it by independent agents" in Alabama and several other southeastern states. Policies were underwritten by ECS Underwriting, Inc., and issued by Greenwich and XL.
The agreement authorized Goff to, among other things, "charge, collect, receive and receipt for all premiums . . . due on all Policies bound or written [thereunder], *Page 1142 
and pay [Greenwich and XL]." It required Goff to "prepare and forward to [Greenwich and XL] on a monthly basis, within (15) days of the end of each calendar month, a detailed premium bordereau and statement of account for the period. . . ." It further provided:
"ARTICLE III. Manager's Duties and Responsibilities
". . . .
 "Q. Premium Financing. At the time of each insurance quotation, [Goff] will prepare a Cananwill Premium Finance Agreement (PFA) using a Cananwill software platform. The quote and the PFA will be faxed to each producing broker with an instruction sheet. The instruction sheet will outline the terms of the PFA, including a 22% deposit and nine installment payments, and will advise that either the signed PFA or a check for 100% pre-payment of the annual premium must accompany all orders to bind. [Goff] will fax the order to bind along with a signed PFA or copy of the pre-payment check to ECS on behalf of [Greenwich or XL].
 "No orders to bind will be processed without full pre-payment or a signed PFA. All original PFAs will be federal expressed to ECS within five (5) days of policy inception date. If a client pre-pays its annual premium, [Goff] will remit net to ECS within 15 days of the close of each month via bordereau, as set forth in Article III(J).
". . . .
"ARTICLE XI. Suspension of [Goff's] Authority
 "[Greenwich/XL] may, by immediate notice to [Goff], suspend any part or all of [Goff's] authority under this Agreement for such time as [Greenwich/XL] may deem necessary to protect [its] interests or reputation if any of the following occur:
". . . .
 "D. Default. The failure of [Goff] to perform its duties and responsibilities under this Agreement including the timely remitting of accounts and monies to [Greenwich/XL], insureds or policyholders and timely and full compliance with the [Greenwich/XL] directives, rules, regulations or manuals. . . .
". . . .
"ARTICLE XII. Termination of Agreement
 "A. [Greenwich/XL] may terminate this Agreement as follows:
". . . .
 "(2) Upon Thirty (30) days['] notice to [Goff] in the event of:
". . . .
 "d. Default. The failure of [Goff] to perform its duties and responsibilities under this Agreement including the timely remitting of accounts and monies to [Greenwich/XL], insureds or policyholders and timely and full compliance with the [Greenwich/XL] directives, rules, regulations or manuals. . . .
"ARTICLE XVIII. Other Terms and Conditions
". . . .
 "I. Notices. Wherever notice is required under this Agreement, it shall be in writing, and deemed to have been received either when [actually] received or 3 days after having been sent by certified mail, and addressed:
"1. If to [Greenwich/XL]:
 "James A. Fowler Senior Vice-President ECS Underwriting, Inc. 505 Thornall St. *Page 1143 
Suite 305 Edison, NJ 08837
 with copy to: Leonard R. Olsen, Jr. Corporate Counsel ECS, Inc. 520 Eagleview Blvd. Exton, PA 19341"
(Emphasis added.)
The agreement also contained an arbitration provision, which provided, in pertinent part:
 "As a condition precedent to any right of action hereunder, any dispute arising out of this Agreement, including its formation, validity or applicability to the dispute, during or after termination of this Agreement, shall be submitted to the decision of a board of arbitration. . . . A decision by the majority of the members of the board shall become the award of the board and shall be final and binding upon all parties to the proceeding."
(Emphasis added.)
Approximately a year after the execution of the agreement, Goff received a letter dated June 13, 2002, from Fowler. The letter stated:
 "I am sending you this letter to inform you that per the terms of our contract we are suspending [Goff's] authority to quote new and renewal business due to unpaid premiums. I am attaching an email I sent to [an executive of Goff] this morning explaining the situation in greater detail.
 "Basically your payments to us are three months in arrears, an unacceptable condition.
 "We will honor all quotations outstanding for new and renewal business through July.
 "I regret that we have been required to take this initiative but the severity of the non-payment issue requires this action."
(Emphasis added.)
Subsequently, Fowler sent Goff a letter dated June 28, 2002, purporting to terminate the agreement. Specifically, the letter stated:
 "Please be advised that per ARTICLE XII, Section B, (TERMINATION OF AGREEMENT) of the Program Manager's Agreement we are terminating said Agreement
effective September 30, 2002.
 "During the period until September 30, 2002, the authority of [Goff] shall remain suspended per the suspension letter dated June 13, 2002.
 "During the period until September 30, 2002, no new business shall be quoted and all renewal business must be referred to us.
 "You should also be advised that we will commence sending notices of non-renewal on October expirations immediately."
(Capitalization original; emphasis added.)
On August 9, 2002, Goff sued ECS on theories of (1) fraud, (2) tortious interference with a contractual/business relationship, (3) the tort of outrage, (4) conspiracy, (5) unfair competition, (6) violation of trade secrets, (7) conversion, and (8) tortious training and supervision. These theories were based on the following factual averments of the complaint:
 "23. On June 13, 2002, Defendant Fowler, Senior Vice-President of Defendant ECS, wrote [Goff] in an attempt to suspend temporarily [Goff's] authority under the Agreement. Defendant Fowler followed said correspondence with an email to [Goff] indicating the suspension would be effective through June 24, 2002. In Defendant Fowler's correspondence of June 13, 2002, he charged that *Page 1144 
[Goff] was late in remitting premiums. Despite Defendant Fowler's position to the contrary, the [Agreement] provides 5 days for the Servicing Company to cure any alleged default. [Goff] provided any and all of the information that Defendant Fowler requested within the time allowed. Soon thereafter, on June 28, 2002, Defendant Fowler sent additional correspondence to [Goff] whereby he attempted to terminate the Agreement. The June 28, 2002, correspondence also attempts to extend the suspension to the termination date.
 "24. The termination letter states that the reason for the termination was underwriting losses. According to Defendant Fowler, the underwriting program was not profitable in 2001 and was not projecting an underwriting profit for 2002. Thus, they wished to withdraw from the market. Although [Goff] disputes that there were in fact excessive underwriting losses, even assuming arguendo there are significant underwriting losses, the clear language of the Program Manager's Agreement does not allow the suspension of [Goff's] authority from the present to the termination date of September 30, 2002. Indeed, it is clear Defendant Fowler and ECS were aware that the Agreement does not allow for unilateral suspension given the documentation from Defendant Fowler limiting the suspension to June 24, 2002.
 "25. Further, Defendants ECS, Fowler, Longo, and other executive officers repeatedly refused to verify or even substantiate their allegations that the Program is a loss. All premiums under the Program Manager's Agreement are sent to Defendant ECS who in turn [is] instructed to send said payment to Greenwich Insurance Company and XL Specialty Insurance Company. It is clear that based on the accurate records and accounting methods, the Program is profitable. Therefore, it is believed that if Defendant ECS claims a loss in the market, it must be because they are not forwarding the entire monies sent to them by [Goff] to XL and Greenwich. [Goff] is not aware of any overrides that would allow such a transaction.
 "26. The Program Manager's Agreement permits a suspension of [Goff's] . . . authority only under certain limited circumstances and only for a limited period of time. Article XI provides, in pertinent part, as follows:
 "`[Greenwich/XL] may, by immediate notice to [Goff], suspend any part or all of [Goff's] authority under this Agreement for such time as [Greenwich/XL] may deem necessary to protect its interest or reputation if any of the following occur:
 "`D. The failure of [Goff] to perform its duties and responsibilities under this Agreement including the timely remitting of accounts and monies to [Greenwich/XL], insureds, the policyholders, and timely compliance with [Greenwich/XL] directives rules, regulations and manuals. . . .'
 "27. The Program Manager's Agreement also clearly sets forth the circumstances under which the Agreement may be terminated and the procedure to be followed for terminating it. Article XII, Section A, describes the limited circumstances under which Greenwich and XL may terminate the Agreement, and Article XII, Section B, provides for termination by either party. Essentially, Section A lays out the grounds of `for cause' termination and allows Greenwich and XL to terminate immediately or on thirty (30) days notice, depending on the `cause.' Section B simply provides that either party may terminate the Agreement *Page 1145 
on sixty (60) days notice without any reason.
". . . .
 "29. The actions of Defendants Fowler and ECS are clearly outside the terms of the Agreement. It was the stated intention of the parties that either side could terminate the Agreement without cause if so desired. However, for the protection of the non-terminating party, a sixty (60) day period during which the relationship would continue was mandated.
 "30. [Goff] is being damaged and will continue to be damaged by the Defendants' unilateral and groundless suspension of . . . authority. [Goff's] inability to quote new and renewal business under the Agreement
has caused [Goff] to incur substantial financial losses that cannot be quantified. . . .
". . . .
 "32. If the suspension is allowed, [Goff] itself may be able to calculate its economic loss and recover money damages for the business loss. However, the consequential damage to those [Goff] employees who will lose their jobs if Defendants are permitted to suspend [Goff's] . . . authority is something that will never be capable of adequate remedy at law.
 "33. Obtaining the suspension and termination of the Program Manager's Agreement was the ultimate goal of the Defendants. All of their efforts detailed above establish their scheme to deceive and cause irreparable harm to [Goff]."
(Emphasis added; footnote omitted.)
In addition to compensatory and punitive damages, Goff sought equitable relief, including an order enjoining ECS from "soliciting, brokering, or marketing services or competing with [Goff's] rights under the Program Manager's Agreement," and from "interfering with the Program Manager's Agreement." In a separate action in the Montgomery Circuit Court, Goff also sued Greenwich and XL, alleging breach of contract. That action, originally styled Goff Group, Inc. v. Greenwich Insurance Company; XLSpecialty Insurance Company, CV-2002-2199, was removed to the United States District Court for the Middle District of Alabama, which ultimately ordered the parties to proceed to arbitration.
ECS moved to compel arbitration of this dispute. The trial court denied the motion, and ECS appealed. The sole issue on appeal is whether ECS, which is not a signatory to the agreement, may, nevertheless, enforce the agreement's arbitration provision as to Goff's claims against it.
Both sides of this dispute acknowledge the general rule that the right to arbitrate is contractual, and that, therefore, a party may not be compelled to arbitrate a dispute, unless it has agreed to do so. Ex parte Cain, 838 So.2d 1020, 1026 (Ala. 2002); Ex parte Lovejoy, 790 So.2d 933, 937 (Ala. 2000); A.G.Edwards Sons, Inc. v. Clark, 558 So.2d 358, 361 (Ala. 1990). This Court, however, has recognized certain exceptions to that general rule whereby a nonsignatory — one who is not a party to the contract containing an arbitration provision — may, nevertheless, compel a signatory to submit a dispute to arbitration. Ex parte Stamey, 776 So.2d 85, 89 (Ala. 2000). One such exception "arises from a third-party-beneficiary theory that affords the [nonsignatory] all the rights and benefits, as well as the burdens, of that contract, including those associated with arbitration." 776 So.2d at 89. The parties agree that this exception is not applicable to this case.
A second exception, which ECS contends applies here, is a variation on the theory of "equitable estoppel." Id. See *Page 1146 
also Ex parte Napier, 723 So.2d 49, 53 (Ala. 1998); Ex parteIsbell, 708 So.2d 571, 574-76 (Ala. 1997). Under certain circumstances, a signatory will be "`equitably estopped from contesting [the nonsignatory's] standing to invoke the [arbitration] clause.'" 708 So.2d at 576 (quoting Sunkist SoftDrinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir. 1993) (first bracketed language added)). At a minimum, estoppel requires that the "description of the parties subject to the arbitration agreement not be so restrictive as to preclude arbitration by the party seeking it." Ex parte Stamey,776 So.2d at 89.
ECS contends that the agreement contains no exclusionary language limiting the application of the arbitration clause to the named signatories. In opposing arbitration, Goff argues that "the arbitration clause and other language . . . expressly limit the arbitration provision to any and all claims between [Goff] and either Greenwich or XL." Goff's brief, at 16-17. In support of that argument, Goff cites a number of cases in which a nonsignatory attempted unsuccessfully to invoke an arbitration provision that was limited to signatories.[1] See, e.g.,Ex parte Cox, 828 So.2d 295 (Ala. 2002); Monsanto Co. v.Benton Farm, 813 So.2d 867 (Ala. 2001); Parkway Dodge, Inc. v.Yarbrough, 779 So.2d 1205 (Ala. 2000); and Southern EnergyHomes, Inc. v. Kennedy, 774 So.2d 540 (Ala. 2000).
We disagree with Goff. The cases it cites involved arbitration clauses fundamentally different from the one at issue. For example, the arbitration provision in Cox provided, in pertinent part: "`Any controversy or claim between or among you
and I [sic] or our assignees arising out of or relating to this contract . . . shall, if requested by either you or me, be determined by arbitration. . . .'" 828 So.2d at 296 (emphasis added). In Monsanto, the arbitration provision stated, in part: "`You [the buyer], your agents, and any other persons having or claiming to have a claim against Seller relating to the goods sold agree that any controversy or claim arising out of or relating to this contract or the goods sold hereunder, . . . may be settled by arbitration. . . .'" 813 So.2d at 869 (emphasis added). Yarbrough involved an arbitration provision that stated, in part: "`The Dealer and Purchaser(s) mutually covenant. . . . that [as to] all disputes . . . resulting from or arising out of the sale transaction entered into . . . Dealerand the purchaser(s) agree to submit such dispute (s) to BINDING ARBITRATION.'" 779 So.2d at 1206 (capitalization original; emphasis added). Kennedy involved an arbitration clause that stated, in part: "`All disputes, controversies or claims . . .between seller and buyer . . . arising out of any transaction or relationship between seller and buyer or arising out of any prior or future dealings between seller and buyer, shall be . . . settled by arbitration.'" 774 So.2d at 542 (emphasis added).
In each of those cases, the language of the arbitration provision limited the clause's application to the parties, or to specifically described third parties. In this case, by contrast, the clause merely requires the arbitration of "any dispute arising out of [the] Agreement, including its formation, validity or applicability to *Page 1147 
the dispute." Its scope is not limited to the parties to the agreement, or to their agents or assignees. Thus, this clause is "not so restrictive as to preclude arbitration by [ECS]." Exparte Stamey, 776 So.2d at 89.
Moreover, the claims against ECS arise out of the agreement. See Kennedy, 774 So.2d at 545 (claims arise out of the contract "`[w]hen each of a signatory's claims against a nonsignatory "makes reference to" or "presumes the existence of" the written agreement'"). In particular, Goff's theory of the case is that ECS suspended, and eventually terminated, the agreement inviolation of the terms of the agreement. For example, paragraph 23 of the complaint avers that Fowler first suspended, and then terminated, the agreement. Paragraph 24 avers that the purported suspension violated the "clear language of the Program Manager's Agreement." Paragraph 26 contains a block quotation from Article XI of the agreement, which defines the circumstances authorizingsuspension of the manager's authority. In paragraph 27, Goff invokes Article XII, which defines the circumstances authorizingtermination of the agreement. In paragraph 29, Goff avers that "[t]he actions of Defendants Fowler and ECS are clearly outsidethe terms of the Agreement." (Emphasis added.) In paragraph 30, Goff avers that it "will continue to be damaged by the Defendants' unilateral and groundless suspension of [Goff's] authority." (Emphasis added.) Finally, Goff's prayer for relief sought, among other things, an order enjoining ECS from "competing with [Goff's] rights under the Program Manager's Agreement," and from "interfering with the Program Manager's Agreement."
To be sure, Goff has stated its claims in tort, rather than contract, language. "`[I]t is well established,'" however, "`that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract.'"Beaver Constr. Co. v. Lakehouse, L.L.C., 742 So.2d 159, 165
(Ala. 1999) (quoting McBro Planning Dev. Co. v. Triangle Elec.Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984)). Whether stated in contract or tort, Goff's claims against ECS arise out of the tripartite Goff-Greenwich/XL-ECS relationship.
Although ECS was not technically a "party" to the agreement, its relationship with Goff was created, as well as defined, by the agreement. Goff's duties under Article III.Q. of the agreement included sending "order[s] to bind along with a signed [premium finance agreement] or copy of the pre-payment check to ECS on behalf of [Greenwich/XL]." That section also set forth the chronology for premium remittances to ECS. The agreement required that notice to Greenwich or XL, whenever required, be sent toECS. In short, Goff's claims against ECS cannot be resolved without reference to, and interpretation of, the agreement.
Finally, Goff's claims against ECS are intertwined with its claims against Greenwich and XL, which will be resolved inarbitration, as ordered by the United States District Court. Although the record does not contain the complaint that was filed in case no. CV-2002-2199, it is clear that Goff's claims against those other signatories also arise out of the agreement.[2]
Goff concedes that "ECS and ECS Underwriting were agents for XL and Greenwich." Goff's brief, at 1 (emphasis *Page 1148 
added). Apparently, it was in this capacity that Fowler, by letters dated June 13, 2002, and June 28, 2002, purported to suspend Goff's authority and to terminate the agreement, respectively. It was "on behalf of" Greenwich and XL that ECS received payments and "order[s] to bind." Under these facts, were we to allow Goff to litigate its claims against ECS, "`"the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor or arbitration effectively thwarted."'" Kennedy, 774 So.2d at 545
(quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947
(11th Cir. 1999)).
For these reasons, the trial court erred in denying ECS's motion to compel arbitration. That order is, therefore, reversed, and this case is remanded for the entry of an order directing the parties to proceed to arbitration.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, and JOHNSTONE, JJ., concur.
[1] A number of other cases on which Goff relies were posturedconversely to this case, that is, the party resisting
arbitration was a nonsignatory. See, e.g., SouthTrust Bank v.Ford, 835 So.2d 990 (Ala. 2002); Cook's Pest Control, Inc. v.Boykin, 807 So.2d 524 (Ala. 2001); and Auvil v. Johnson,806 So.2d 343 (Ala. 2001). This distinction is significant, because "the doctrine of estoppel is applicable only to estop asignatory from avoiding arbitration." Ford,835 So.2d at 995.
[2] Indeed, were it otherwise, the signatories would not have been ordered to resolve the dispute in the arbitral forum.