971 So.2d 681 (2007)
NOLAND HEALTH SERVICES, INC., et al.
v.
Peter WRIGHT, as the administrator of the estate of Dorothy Willis, deceased.
No. 1060061.
Supreme Court of Alabama.
May 4, 2007.
*682 Joseph L. Reese, Jr., of Starnes & Atchison, LLP, Birmingham, for appellants.
Kathryn S. Harrington of Hollis & Wright, P.C., Birmingham; and Michael K. Beard of Marsh, Richard & Bryan, P.C., Birmingham, for appellee.
James F. Henry and Richard G. Wheelahan of Johnston Barton Proctor & Powell, LLP, Birmingham, for amici curiae Alabama Nursing Home Association and the Alliance for Long-Term Care Quality Improvement, in support of the appellants.
WOODALL, Justice.
Noland Health Services, Inc., The Village at Cook Springs, LLC ("The Village"), and Ed Stevens appeal from an order denying their motion to compel the arbitration of an action by Peter Wright, as the administrator of the estate of Dorothy Willis, deceased, seeking damages for the personal injuries and wrongful death of Dorothy Willis. We affirm.
*683 On March 25, 2004, Willis, accompanied by her daughter-in-law, Vicky Willis, was admitted to the skilled-nursing facility at The Village ("the nursing home"), which was owned and/or operated by Noland Health Services, Inc., and The Village. At that time, Dorothy was suffering from dementia related to Alzheimer's disease. She was admitted pursuant to a written agreement ("the agreement"), which provided, in pertinent part:
"1. References to the Parties
". . . .
"References to `we,' `our,' the `Facility,' and to `our Facility' are references to [the nursing home].
"References to `you' and `your' are references to any person signing this agreement as Resident or as the Responsible Party.

"There are also spaces for this Agreement to be signed by a Legal Representative and Responsible Party, if applicable, on your behalf.
"A Legal Representative is an individual who, under independent legal authority, such as a court order[,] has authority to act on the Resident's behalf. Examples of a Legal Representative include a guardian, a conservator, and the holder of a Durable Power of Attorney executed by the Resident. Documents evidencing a person's Legal Representative status must be provided to us. If you have a court appointed guardian or conservator he or she must sign this Agreement for it to be valid.

"A. Responsible Party is an individual who voluntarily agrees to honor certain specified obligations of the Resident under this agreement. Examples of a Responsible Party include a relative or a friend of the Resident. We may not require a person to sign this agreement as a Responsible Party unless the person has legal access to or physical control of the Resident's available income or resources to pay for the care and services we provide. We may decline to admit any Resident who has no source of payment for all or part of the Resident's stay.
"2. Limitations on the Obligations of a Legal Representative and Responsible Party under this Agreement
"We may not require a third party to guarantee payment to us as a condition of admission to, of expedited admission to, or of continued stay in our Facility.
"3. Obligations of a Legal Representative or Responsible Party under this Agreement

"If you sign this Agreement as a Legal Representative or Responsible Party you agree to use the Resident's available income and resources to pay for the Resident's care and services."
(Emphasis added.)
The second page of the agreement had blank spaces for identification of the parties. In the space for "Resident," Vicky wrote in the name of "Dorothy Willis." Another space for the designation of "Resident's Legal Representative (if applicable)" was left blank. Still another space for the designation of "Resident's Responsible Party (if applicable)" contained the signature of "Vicky Willis." The last page of the agreement, the signature page, contained lines with the identical designations. The signature page contained the signature of a "Representative of [the] Nursing Facility." The lines designated for the signatures of the "Resident" and the "Resident's Legal Representative (if applicable)" were left blank. The line designated for the "Resident's Responsible Party (if applicable)" contained the signature of Vicky Willis.
*684 The agreement also contained an arbitration provision, which provided, in pertinent part:
"[A]ny controversy, dispute, cause of action or claim now or hereafter existing between or among you and [the nursing home] or its agents, or which is asserted by one or more persons or entities (including, but not limited to, party to this Agreement) claiming any rights under this Agreement . . . includ[ing] . . . any claim arising out of, relating to, or concerning this Agreement in any way, and/or the care or treatment of you in the Facility, whether in contract, tort, based on statute, equity, . . . including, but not limited to, negligence and wrongful death claims. . . . shall [be submitted] to binding arbitration."
In May 2004, Dorothy Willis fell in the nursing home and broke her hip. In January 2005, she fell again and broke her neck. On January 26, 2005, a complaint styled "Dorothy Willis individually & Luther and Vicky Willis as her next friends" was filed in the St. Clair Circuit Court against Noland Health Services, Inc., The Village, and Stevens, who was the administrator of the nursing home (hereinafter collectively referred to as "Noland"). The complaint alleged, among other things, that Dorothy "was neglected and the care and treatment she received was substandard and did not meet the standard of care of the same or similar health care facilities." It averred that "[s]aid negligent and wanton conduct on the part of [Noland], their agents, and/or assigns, was a breach of the standard of medical care," and that "[a]s a direct and proximate result of such negligent, wanton, reckless, malicious and/or intentional conduct, [Noland] caused Dorothy Willis to suffer medical decline, . . . a broken hip, . . . and . . . a broken neck." It also alleged that Dorothy Willis had developed pneumonia as a direct result of her injuries and that she had not received prompt and appropriate emergency medical care following her injuries.
Count four of the complaint averred, in toto:
"26. Plaintiff re-adopts and re-alleges and incorporates the allegations in all preceding paragraphs as if fully set forth herein:
"27. [Noland] and [its] agents and/or assigns breached [its] contract with Plaintiff and Plaintiff's family in that [it] failed to comply with the terms and conditions set forth in the contract for admission. As a direct and proximate cause of said breach of contract, Plaintiff was caused to suffer great pain and mental anguish.
"WHEREFORE, PREMISES CONSIDERED, the Plaintiff hereby demands judgment against [Noland] for compensatory and punitive damages in a sum to be determined by the jury."
(Emphasis added.)
On February 2, 2005, Dorothy Willis died. On February 25, 2005, Noland moved to compel arbitration of the claims against it based on the arbitration provision in the agreement. On February 28, 2006, Peter Wright, as administrator of Dorothy Willis's estate, filed an amended complaint. The amended complaint "readopt[ed] and realleg[ed] each and every claim set forth in [the] original complaint." It also added a wrongful-death claim, alleging that Willis had died from the broken neck and pneumonia as a proximate result of Noland's "negligence and wanton breach of the standard of care."
Noland answered the amended complaint, asserting that the wrongful-death claim was also due to be arbitrated. On September 19, 2006, the trial court denied the motion to compel arbitration. From that order, Noland appealed.
*685 Our standard of review is well settled.
"`This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala.2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce. Id. "[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question." Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (opinion on application for rehearing).'"
Elizabeth Homes, L.L.C. v. Gantt, 882 So.2d 313, 315 (Ala.2003) (quoting Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000)). "Absent live testimony, the trial court's findings of fact carry no presumption of correctness and we will review the trial court's factual and legal conclusions de novo." W.D. Williams, Inc. v. Ivey, 777 So.2d 94, 98 (Ala.2000); see also Justice v. Arab Lumber & Supply, Inc., 533 So.2d 538 (Ala.1988). The dispositive issue on appeal is whether Noland has met its burden of showing the existence of a contract requiring arbitration of the claims asserted in this action.
As a general rule, "a nonsignatory to an arbitration agreement cannot be forced to arbitrate her claims." Cook's Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001). Nevertheless, Noland contends that the agreement is enforceable against Wright as Dorothy Willis's personal representative, "notwithstanding the fact that Dorothy Willis did not personally sign it." Noland's brief, at 46. This is so, because, Noland argues, "Vicky Willis signed the arbitration agreement on Dorothy Willis's behalf as Dorothy Willis's `responsible party.'" Id. (emphasis added). Wright, however, contends that Vicky's signature on the agreement as the "responsible party" was ineffective to bind Dorothy to the agreement. We agree with Wright.
It is undisputed that when Vicky was given the option to sign the agreement as a "responsible party" or as a "legal representative," she chose the former option. The agreement explained that "[a] Legal Representative is an individual who, under independent legal authority, such as a court order[,] has authority to act on the Resident's behalf" and listed "a guardian, a conservator, and the holder of a Durable Power of Attorney executed by the Resident" as examples of legal representatives.
Wright contends that at the time of Dorothy's admission to the nursing home, Vicky "did not hold power of attorney for Mrs. Willis, was not her guardian, and had never been appointed by [Dorothy] or by a court of competent jurisdiction to handle the affairs" of her mother-in-law. Wright's brief, at 1-2. Noland argues that Wright is essentially estopped to deny that Vicky possessed a power of attorney. This is so, because, it insists, in paragraph one of the original complaint the Willises asserted: "Plaintiffs Luther Willis and Vicky Willis are her duly appointed attorneys in fact and the son and daughter-in-law of Dorothy Willis." See Jones v. Kassouf & Co., 949 So.2d 136, 142 (Ala.2006)(Lyons, J., dissenting) ("`Normally, factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them.'" (quoting White v. ARCO/Polymers, *686 Inc., 720 F.2d 1391, 1396 (5th Cir. 1983))).
Wright, however, insists that a durable power of attorney can be created only in a manner and form consistent with Ala.Code 1975, § 26-1-2, which provides, in pertinent part:
"A durable power of attorney is a power of attorney by which a principal designates another his or her attorney in fact or agent in writing and the writing contains the words `This power of attorney shall not be affected by disability, incompetency, or incapacity of the principal' or `This power of attorney shall become effective upon the disability, incompetency, or incapacity of the principal' or similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding the principal's subsequent disability, incompetency, or incapacity."
(Emphasis added.) Wright contends that a party may not, merely through an averment in a pleading, circumvent the statutory requirements of a writing, which shows the unmistakable intent of the principal to create the relationship.
We need not, however, resolve the dispute over the implications of paragraph one of the original complaint. This is so, because in executing the agreement Vicky did not sign Dorothy's name in any purported capacity and did not purport to be Dorothy's legal representative. Vicky's signatory role was, therefore, effectively that of a "next friend," who "voluntarily agree[d] to honor certain specified obligations" of her mother-in-law. (Emphasis added.) It has long been established in this State, however, that one who purports to act merely as a "next friend" of a "non compos mentis" is "wholly without authority to make any contract that would bind her of her estate." Page v. Louisville & Nashville R.R., 129 Ala. 232, 238, 29 So. 676, 678 (1901).
In that connection, the trial court found that "Dorothy Willis was not competent at the time her daughter-in-law signed the contract of admission in this case." (Emphasis added.) Indeed, there is no conflict in the evidence, which includes medical reports as to Dorothy Willis's mental capacity. One such report describes Dorothy as "an 86 year old demented female" (emphasis added), who was "[n]ot oriented to person, place or time." In another medical report, she is described as "always confused." Thus, we conclude that Vicky's signature in the capacity of a next friend, or "responsible party," was ineffective to bind Dorothy or her personal representative to the agreement.
In arriving at this conclusion, we have not overlooked Briarcliff v. Turcotte, 894 So.2d 661 (Ala.2004), or Owens v. Coosa Valley Health Care, Inc., 890 So.2d 983 (Ala.2004), also cited by Noland. Those cases are distinguishable. Owens involved an action by Linda Owens against the Coosa Valley Health Care Nursing Home ("Coosa Valley") alleging personal injuries and wrongful death. Owens was the daughter and personal representative of Elma Tucker, who died while in the care of Coosa Valley. 890 So.2d at 984. The only signatories to any relevant admission documents were Coosa Valley and Owens. Id. However, Owens signed Tucker's name to the admission documents as Tucker's "Guardian/Sponsor." 890 So.2d at 986 (emphasis added). Moreover, the admission agreement defined, in addition to Coosa Valley as the first party, "`the undersigned Patient, Guardian and Sponsor (hereinafter known as "Patient")'" as the second party. 890 So.2d at 984 (emphasis added). Thus, the definition of "patient" included Owens, the plaintiff in the action, who was a signatory to the admission *687 agreement. In holding that Owens was compelled to arbitrate her claims against Coosa Valley, we explained that it was "undisputed" that Owens signed the agreement "on behalf of Tucker," as her guardian/sponsor, and that the "`meaning of "Patient" [included] Patient and . . . her . . . guardian[], heirs, [and] executor[].'" 890 So.2d at 987 (emphasis added). In other words, Owens was personally bound, and there was no issue regarding Tucker's mental capacity or Owens's authority to act on Tucker's behalf.
Briarcliff involved consolidated appeals from orders refusing to compel the arbitration of two wrongful-death actions in the Shelby Circuit Court, 894 So.2d at 663, which orders this Court reversed. 894 So.2d at 668. One action was prosecuted by David Turcotte, as personal representative of Noella Turcotte, deceased. 894 So.2d at 663. The other action was prosecuted by Kyra L. Woodman, as personal representative of Sarah Carter, deceased. Id. Turcotte and Carter had died while in the care of a "nursing home owned and operated by Briarcliff [Nursing Home, Inc., d/b/a Integrated Health Services at Briarcliff (`Briarcliff')]." 894 So.2d at 663. The signatories to the admission agreements were Briarcliff and each of the personal representatives. David Turcotte had signed in his capacity as a "`Fiduciary Party,'" and Woodman had signed as "`Attorney-In-Fact under [a] validly executed power of attorney.'" 894 So.2d at 664. As in Owens, there was no issue regarding the authority of either signatory/personal representative to execute the agreement on behalf of his or her admittee.
This case differs from Owens and Briarcliff in two fundamental respects. First, unlike the plaintiffs in Owens and Briarcliff, Wright specifically challenges the efficacy of Vicky Willis's signature to bind Dorothy Willis. As noted above, Vicky did not purport to sign the agreement as Dorothy's "legal representative"; she signed only as one acting in the nature of a "next friend," who "voluntarily agree[d] to honor certain specified obligations" of Dorothy. This fact was obviously known by the nursing home at the time Dorothy was admitted.
Second, unlike Wright, the plaintiff in Owens and the two plaintiffs in Briarcliff were signatories to an agreement to arbitrate. Although Vicky Willis signed the agreement, she was never the plaintiff, unlike Owens, Turcotte, and Woodman, who sued as personal representatives of their decedents. Moreover, Wrightwho signed no relevant admission documentwas substituted as the proper plaintiff before the trial court entered its order denying Noland's motion to compel arbitration.
Noland next contends that Wright is bound to arbitrate because his amended complaint incorporates the breach-of-contract claim of the original complaint. This is so, because, it insists, Wright "manifested assent to the validity of the arbitration agreement by claiming the benefits of the [agreement]" through his pleadings. Noland's brief, at 50 (emphasis added). For that proposition, Noland cites Lyles v. Pioneer Housing Systems, Inc., 858 So.2d 226 (Ala.2003); and Southern Energy Homes, Inc. v. Ard, 772 So.2d 1131 (Ala.2000). The rule developed in those cases is that a party may not base an action on provisions in a contract while repudiating an arbitration clause in the contract.
"In [Southern Energy Homes, Inc. v.] Ard [, 772 So.2d 1131 (Ala.2000)], the Ards sued Southern Energy Homes, the manufacturer of the Ards' mobile home, alleging a violation of Southern Energy's express warranty, a violation of the Magnuson-Moss WarrantyFederal Trade Commission Improvement Act, 15 *688 U.S.C. § 2301 et seq. (`the Magnuson-Moss Act'), and the negligent manufacture of the mobile home. The Ards also alleged fraud. Southern Energy sought to compel arbitration of the Ards' claims on the basis of an arbitration provision contained in its express warranty. Evidence in the form of an affidavit by Southern Energy employee Don McNutt indicated that the Ards had requested and received service under the warranty on their mobile home from Southern Energy. The evidence also indicated that the Ards did not sign any written agreement with Southern Energy expressly calling for arbitration. The trial court denied Southern Energy's motion to compel arbitration, and it appealed. After discussing the burdens imposed upon Southern Energy to establish its right to compel arbitration . . ., this Court concluded that the trial court's order denying arbitration was due to be reversed:
"`The Ards are contractually bound to the arbitration provisions for two reasons. First, the affidavit of Don McNutt establishes, without contradiction, that the Ards have accepted the benefits of the warranty containing the arbitration provisions. This acceptance constitutes the Ards' acceptance of the arbitration provisions themselves. Rush v. Atomic Electric Co., 384 So.2d 1067 (Ala.1980). Second, the Ards have sued Southern Energy on the theory, among others, of express warranty. The only express warranty included in the evidentiary materials is the one containing the arbitration provisions. A plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions. Value Auto Credit, Inc. v. Talley, 727 So.2d 61 (Ala.1999); Infiniti of Mobile, Inc. v. Office, 727 So.2d 42 (Ala.1999); Georgia Power Co. v. Partin, 727 So.2d 2 (Ala.1998); Delta Constr. Corp. v. Gooden, 714 So.2d 975 (Ala.1998); Ex parte Dyess, 709 So.2d 447 (Ala.1997).'
"772 So.2d at 1134-35. . . .
"In Lyles [v. Pioneer Housing Systems, Inc., 858 So.2d 226 (Ala.2003) ], the Lyleses, also purchasers of a mobile home, sued the mobile-home manufacturer, Pioneer, alleging breach of contract, breach of express and implied warranties, breach of the Magnuson-Moss Act, negligence, and fraud. Pioneer sought to compel arbitration based upon an arbitration provision contained in its express warranty. Two months after the motion to compel arbitration was filed, the Lyleses dismissed their breach-of-express-warranty claim. After arguments on the motion to compel arbitration, the trial court entered an order granting the motion. Three days later the Lyleses voluntarily dismissed their Magnuson-Moss Act claim and then filed a motion to vacate the order compelling arbitration. The trial court denied that motion, and the Lyleses appealed. On appeal, they argued that the trial court erred in compelling arbitration because they had never entered into a written contract calling for arbitration. As in Ard, the Court in Lyles recognized that the arbitration provision was included in the express warranty, which was not a document that the Lyleses were required to sign, and it considered whether `the Lyleses availed themselves of the benefits of Pioneer's written warranty, thus manifesting their agreement to the arbitration provision contained in it.' 858 So.2d at 228. After discussing Ard, the Court analyzed the situation in Lyles as follows:
"`Although the Lyleses voluntarily dismissed their express-warranty claim before the trial court ruled on *689 Pioneer's motion to compel arbitration, they did not voluntarily dismiss their Magnuson-Moss Act claim until after the trial court had issued its order compelling arbitration. Thus, when the trial court entered its ruling on the motion to compel arbitration the Lyleses' Magnuson-Moss Act claim was still pending.
"`In their complaint, the Lyleses made the following allegations in support of their Magnuson-Moss Act claim against Pioneer:
"`"Count Nine: Violation of Magnuson-Moss Warranty Act:
"`". . . .
"`"37. [Pioneer] failed to perform under its written warranties and complete repairs to the [Lyleses'] mobile home as guaranteed in the express warranties. [Pioneer] failed in its efforts to properly repair defects in the mobile home in violation of 15 U.S.C. 2301 et seq.

"`"38. [The Lyleses] timely advised [Pioneer] of defects in their mobile home on numerous occasions and afforded [Pioneer] reasonable opportunity to comply with [its] warranties and complete repairs.
"`"39. As a proximate result, [the Lyleses] were caused damages including but not limited to, actual and consequential damages; attorneys' fees, inconvenience, annoyance and mental anguish."
"`The only express or written warranty in the record is Pioneer's express warranty, which contains the arbitration provision quoted above. Like the Ards, the Lyleses purported to claim the benefits of Pioneer's express warranty by alleging that Pioneer should be bound to perform its duties under the warranty, while simultaneously repudiating the condition contained in the warranty that warranty disputes would be settled by arbitration. Because the Lyleses manifested assent to Pioneer's written express warranty by availing themselves of its benefits, the trial court correctly held them to the conditions of the warranty by compelling arbitration as to the warranty disputes, as the arbitration provision found in the warranty stipulated.'
"858 So.2d at 230 (footnote omitted)."
Springhill Nursing Homes, Inc. v. McCurdy, 898 So.2d 694, 698-701 (Ala.2004)(emphasis added).
Noland overlooks a fundamental distinction between this case and Ard and Lyles on which it relies for its assent-through-pleading argument. Those cases did not involve claims against a health-care provider for redress of medical injuries allegedly resulting from improper care or treatment. The nursing home is, however, "considered to be a `hospital' [as defined in Ala.Code 1975, §§ 6-5-481 and -542(1),] and thus, . . . is covered by the provisions of the [Alabama] Medical Liability Act" of 1987, Ala.Code 1975, § 6-5-540 et seq. ("the Act"), supplementing the Alabama Medical Liability Act of 1975, § 6-5-480 et seq. Ex parte Northport Health Serv., Inc., 682 So.2d 52, 55 (Ala.1996). Section 6-5-542(2) provides:
"The standard of care is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases. A breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death. This definition applies to all actions for injuries or damages or wrongful death whether in contract or tort and whether *690 based on intentional or unintentional conduct."
(Emphasis added.) The coverage of the Act "is broad; it applies to all actions alleging `liability' was well as `error, mistake, or failure to cure, whether based on contract or tort.' [It] encompasses contract claims alleging breach of express and implied warranties. . . ." Mobile Infirmary v. Delchamps, 642 So.2d 954, 957 (Ala. 1994) (emphasis added).
"Although the [Act] applies only to medical-malpractice actions, a plaintiff cannot avoid application of the [Act] by `creative pleading.' This Court has consistently held that it is the substance of the action, rather than the form, that is the touchstone for determining whether an action is actually one alleging medical malpractice."
Mock v. Allen, 783 So.2d 828, 832 (Ala. 2000). Thus, the essence of any medical-malpractice action, regardless of how it is pleaded, is compliance with the standard of care set forth in the Act. In other words, the scope of the healthcare provider's duties is defined, not by a contract between the parties, but by the legislature.
This is a medical-malpractice action. In a nutshell, the allegations of the amended complaint are that Dorothy suffered injuries and death as the result of Noland's "breach of the standard of medical care." (Emphasis added.) Unlike the Magnuson-Moss Act claims in Lyles, namely, that Pioneer "failed to . . . complete repairs to the [Lyleses'] mobile home as guaranteed," Lyles, 858 So.2d at 230, which claims arose under Pioneer's express written warranty, any express or implied promises in the agreement are encompassed within the Act, and Wright's medical-malpractice claims are governed by the standard promulgated by the legislature, rather than written expressions of the nursing home.
Indeed, Wright's breach-of-contract claim is set forth only in conclusory and generic terms. Although it alleges that Noland "breached [its] contract with Plaintiff and Plaintiff's family" (emphasis added), it contains no claims by the next friends, Luther Willis and Vicky Willis, in their individual capacities. Because Wright's cause of action is governed by the Actindependent of the agreementWright cannot be said to have "manifested assent" to specific provisions of the agreement simply by averring a breach of that agreement. Consequently, Wright is not bound by the agreement or by the arbitration clause therein.
In short, Noland has directed us to no case on point holding that a nonsignatory personal representative is bound to arbitrate a medical-malpractice action seeking damages for the injuries and wrongful death of the nonsignatory decedent. It is well settled, of course, that, because the right to arbitrate is contractual, "a party may not be compelled to arbitrate a dispute, unless it has agreed to do so." ECS, Inc. v. Goff Group, Inc. 880 So.2d 1140, 1145 (Ala.2003). See also Ex parte Cain, 838 So.2d 1020, 1026 (Ala.2002); Ex parte Lovejoy, 790 So.2d 933, 937 (Ala.2000); A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358, 361 (Ala.1990). Noland has presented no evidence showing that either Wright or Dorothy Willis expressly agreed to arbitrate claims against it, and Wright has not manifested an assent to arbitrate through his involvement in this action. Noland has, therefore, failed to carry its burden of demonstrating the existence of a contract binding Wright or the decedent to an arbitration provision.
For these reasons, the trial court did not err in denying the motion to compel arbitration. That order is, therefore, affirmed.
AFFIRMED.
*691 COBB, C.J., and PARKER, J., concur.
LYONS and MURDOCK, JJ., concur in the result.
SEE, STUART, SMITH, and BOLIN, JJ., dissent.
SEE, Justice (dissenting).
The complaint filed on Dorothy Willis's behalf alleges that Noland Health Services, Inc., The Village at Cook Springs, LLC, and Ed Stevens (hereinafter collectively "Noland") breached its contract to provide nursing-home services to Dorothy. Vicky Willis, Dorothy's daughter-in-law, signed the contract admitting Dorothy into the nursing-home facility. The main opinion holds that because the underlying action is in substance a medical-malpractice action and because the complaint alleges breach of contract in only "conclusory and generic terms[,] . . . [Peter] Wright[, the administrator of Dorothy's estate,] cannot be said to have `manifested assent' to specific provisions of the agreement simply by averring a breach of that agreement." 971 So.2d at 690 I disagree; therefore, I respectfully dissent.
In the initial complaint, the plaintiffs  Dorothy along with Luther Willis and Vicky Willis, Dorothy's son and daughter-in-law, as next friends  alleged that "Plaintiff[ ] and Plaintiff's family contracted with [Noland] to provide [Dorothy] with twenty-four hour skilled care, supervision, and assistance. . . . Pursuant to said contract . . . [Noland] owed a duty to Dorothy Willis to protect and promote her rights . . . to be free from abuse and neglect and to receive adequate medical care." In the first amended complaint, Wright, the administrator of Dorothy's estate, "readopt[ed] and reallege[d] each and every claim set forth in the original complaint," which necessarily included the factual allegation that a contractual relationship existed. The complaint alleges that "[Noland] and [its] agents and/or assigns breached [its] contract with Plaintiff and Plaintiff's family in that [it] failed to comply with the terms and conditions set forth in the contract for admission." The only contract reflected in the record is the admission contract containing the arbitration provision.
The main opinion concludes that Wright is not bound by the arbitration provision in the admission contract because, it reasons, even though Wright has claimed that Noland breached the admission contract, Wright did not succeed in asserting a breach-of-contract claim. Although it may be true, as the main opinion asserts, that Wright has put forward, in substance, a theory of recovery based on medical malpractice, the issue is not what the claim is in substance, but, instead, whether Dorothy or Wright had manifested assent to or ratified the admission contract. If either manifested his or her assent to or ratified the admission contract, Wright must arbitrate the claims as that contract requires.
The main opinion argues that, although Wright avowed the contract and asserted a cause of action for the breach of that contract, Wright did not actually raise a breach-of-contract claim and, therefore, did not manifest his assent to the admission contract. First, I cannot agree that Wright has failed to assert a breach-of-contract claim because that claim, although clearly intended to allege a breach of contract, is phrased in "conclusory and generic terms." The plaintiffs specifically alleged that a contract exists. The breach-of-contract claim is expressly based on Noland's "fail[ure] to comply with the terms and conditions set forth in the contract for admission." This language, along with the other factual allegations in the complaint, is sufficient to state a claim of breach of contract. See Cain v. Howorth, 877 So.2d 566, 575 (Ala.2003) ("[A] complaint is sufficient *692 if it puts the defendant on notice of the claims against him. . . . ").
Second, and more importantly, I also disagree with the contention that, because the substance of the claim sounds in tort rather than in contract, Wright did not manifest his assent to the admission contract and is not bound by it. In support, the main opinion cites § 6-5-542(2), Ala. Code 1975, a part of the Alabama Medical Liability Act of 1987, § 6-5-540 et seq., Ala.Code 1975 ("the AMLA"), which provides:
"The standard of care is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases. A breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death. This definition applies to all actions for injuries or damages or wrongful death whether in contract or tort and whether based on intentional or unintentional conduct."
However, in Ex parte Addiction & Mental Health Services, Inc., 948 So.2d 533, 535 (Ala.2006), this Court rejected the argument that "the AMLA applies to all claims against health-care providers arising out of the relationship between the health-care provider and the patient." Instead, as the main opinion recognizes, the AMLA regulates only actions where the plaintiff alleges to have suffered a "medical injury." Ex parte Addiction & Mental Health Servs., 948 So.2d at 536.
Further, the AMLA on its face does not bar a plaintiff from joining a contract claim with a medical-malpractice claim, nor does it necessarily bar a plaintiff from seeking recovery for medical malpractice under a breach-of-contract theory. See § 6-5-542(2), Ala.Code 1975 ("This definition applies to all actions for injuries or damages or wrongful death whether in contract or tort. . . ."). In Collins v. Ashurst, 821 So.2d 173, 176 (Ala.2001), this Court held that the AMLA did not bar "more than one type of action for medical malpractice [from being] brought" under it. In Collins, the plaintiff attempted to recover for the same injury under three different theories: medical malpractice, assault and battery, and trespass to the person. We held that "the trial court erred in determining that the AMLA allows for only one cause of action, and, consequently, in striking Collins's counts for assault and battery and trespass." Collins, 821 So.2d at 177. Although each claim would have to be brought following the requirements of the AMLA, we held that a plaintiff could state a claim for the same injury under multiple legal theories. We based our reasoning, in part, on the statements in the AMLA that it applies to actions "whether in contract or tort." 821 So.2d at 176. Thus, it appears that a plaintiff could join a breach-of-contract claim with a medical-malpractice claim, or even bring a breach-of-contract claim based on a breach of the medical standard of care.
The main opinion relies on our cases holding that a party may not, through creative pleading, frame a medical-malpractice claim as a breach-of-contract claim and thereby avoid the specific requirements of the AMLA. In Mobile Infirmary v. Delchamps, 642 So.2d 954, 956-57 (Ala.1994), the plaintiff attempted to avoid the statute of limitations of the AMLA by alleging fraud and breach of warranty instead of medical malpractice. In Mock v. Allen, 783 So.2d 828, 834-35 (Ala.2000), the plaintiff argued that the AMLA did not apply to his case so that he could avoid the application of § 6-5-551, Ala.Code 1975, which limits the admissibility of "similar *693 acts" evidence. In both of those cases, the plaintiffs attempted to evade the requirements of the AMLA through creative pleading.
The complaint in the case before us does not attempt to recast a medical-malpractice claim as a breach-of-contract claim to circumvent the procedural and substantive requirements of the AMLA; instead, Wright alleges both breach of contract and medical malpractice. That is, in addition to alleging a medical-malpractice claim, Wright also recognizes the contract and asserts rights under it. Under Collins, Wright was entitled to bring his claims under multiple legal theories. Collins, 821 So.2d at 177. The two claims are not necessarily mutually exclusive; however, even if the claims are redundant, because Wright has not attempted to evade the substantive and procedural requirements of the AMLA, there is no reason for, nor any authority to support, this Court's decision to recast the complaint in this case.
The plaintiff is the "master of his complaint." See BP Chems. Ltd. v. Jiangsu Sopo Corp., 285 F.3d 677, 685 (8th Cir. 2002) ("One might read the [United States Supreme Court's] discussion as extending to a district judge broad discretion to recast a plaintiff's claims to fit the judge's understanding of the case. Yet we can scarcely imagine the Court intended that result. Such an expansion of judicial power is at loggerheads with liberal notice pleading rules and our settled understanding that a plaintiff is the master of his complaint."). If a plaintiff wishes to plead herself out of court and into arbitration, this Court allows her to do so. As we recognized in Ex parte Blankenship, 893 So.2d 303, 306 (Ala.2004),
"`[i]t is a "well-settled rule that a party is bound by what it states in its pleadings."' Help At Home, Inc. v. Medical Capital, L.L.C., 260 F.3d 748, 753 (7th Cir.2001); Lucas v. Burnley, 879 F.2d 1240, 1242 (4th Cir.1989); Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1983). Thus, `a plaintiff can . . . plead himself out of a claim by including unnecessary details contrary to his claims.' Sprewell[ v. Golden State Warriors,] 266 F.3d [979] at 988 [(9th Cir.2001)] (emphasis added) (citing Steckman v. Hart Brewing, Inc., 143 F.3d 1293 (9th Cir. 1998)). See also Soo Line R.R. v. St. Louis Southwestern Ry., 125 F.3d 481, 483 (7th Cir.1997) (`A plaintiff can "plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts."'); Fraternal Order of Police, Strawberry Lodge No. 40 v. Entrekin, 294 Ala. 201, 212, 314 So.2d 663, 673 (1975) (`"The pleader must be careful not to allege facts that constitute a defense to his claim for relief, or, for that matter, a defense to his defense."') (quoting 2A Moore's Federal Practice ¶ 8.02)."
In Blankenship, the plaintiff asked this Court to disregard factual allegations in the complaint that established the defendant's immunity from suit. We refused, stating: "In effect, [the plaintiff] urges this Court to amend her complaint by striking paragraph seven, in order to the eliminate the jurisdictional impediment that paragraph presents to her claim." 893 So.2d at 306. We noted that although she did not need to plead paragraph seven in order to state a claim, "[h]aving done so, . . . she cannot avoid the legal consequences of those factual allegations." Blankenship, 893 So.2d at 306 (footnote omitted). Similarly, here Wright pleaded sufficient facts to establish that there was a contract, and he similarly should be bound to the legal consequences of those allegations.
*694 Further, by affirmatively alleging the existence of the contract, Dorothy Willis and Wright ratified the contract. In Georgia Power Co. v. Partin, 727 So.2d 2 (Ala. 1998), we dealt with similar circumstances. Partin sued Georgia Power after he was injured in a fall from a catwalk on the end of a railroad car. Partin alleged that Georgia Power behaved negligently or wantonly in failing to correct unsafe work procedures, in maintaining the site where Partin was injured, and in failing to provide adequate lighting and a crosswalk over the train. Partin then amended his complaint to state a breach-of-contract claim against Georgia Power, arguing that Georgia Power had breached an operations agreement that it had entered into with Orba Corporation, which operated the coal-loading facility on the site. The operations agreement, which contained an arbitration provision, provided that Georgia Power had certain obligations in maintaining the site where Partin was injured. The trial court granted permission to amend; thus, Partin stated a breach-of-contract claim as a third-party beneficiary of the operations agreement as well as his negligence cause of action based on the same injury.
Georgia Power moved to compel arbitration of the claims pursuant to the arbitration provision. Partin argued that he was not bound by the arbitration provision because he was not a signatory to the operations agreement between Georgia Power and Orba. This Court noted the "well-established principle of Alabama law that a contract made for the benefit of a third person may, at his election, be accepted and enforced by him." Partin, 727 So.2d at 5. We further stated: "`The law is clear that a third party beneficiary is bound by the terms and conditions of the contract that it attempts to invoke. "The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract."'" Partin, 727 So.2d at 5 (quoting Interpool Ltd. v. Through Transp. Mut. Ins. Ass'n Ltd., 635 F.Supp. 1503, 1505 (S.D.Fla. 1985), quoting in turn Trans-Bay Eng'rs & Builders, Inc. v. Hills, 551 F.2d 370, 378 (D.C.Cir.1976)). The Court held that, because Partin brought the claim as a third-party beneficiary of the operations agreement, which he had not signed, he had, in effect, agreed to all of the terms of the contract, including the arbitration provision.
As in this case, the issue in Partin was whether Partin had assented to the contract by ratifying it. "`Assent must be manifested by something. Ordinarily, it is manifested by a signature. [However], [a]ssent may be manifested by ratification.'" Ex parte Cain, 838 So.2d 1020, 1027 (Ala.2002) (quoting Southern Energy Homes, Inc. v. Hennis, 776 So.2d 105, 108 (Ala.2000)). Thus, by invoking the contract, Partin demonstrated that he agreed to its terms and was willing to be bound by it, even though he did not sign the contract. As this Court has held, "[a] party, by his actions and acceptance of the benefits of a contract and by operating under that contract, may ratify and confirm it, even though his actual signature is not affixed." Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 305 (Ala.1986).
Other cases have held that a third-party beneficiary manifests assent to a contract by pleading a breach of that contract. In Southern Energy Homes, Inc. v. Ard, 772 So.2d 1131, 1134 (Ala.2000), the Ards had purchased a mobile home manufactured by Southern Energy. They sued, alleging a breach of express warranty, a Magnuson-Moss Act violation, and the negligent manufacture for the mobile home. Southern Energy moved to compel the arbitration of the Ards' claims on the basis of an arbitration provision in the express warranty for the mobile home. The trial court denied *695 the motion, finding that the Ards had not signed the warranty. This Court reversed the order denying the motion to compel for two reasons. First, the Ards had accepted the benefits of the express warranty by requesting and receiving service on the mobile home as provided by the express warranty. Second, the Ards had brought their claim on the theory, among others, of express warranty. The only express warranty in evidence was the one containing the arbitration provision. This Court held that "[a] plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions." Ard, 772 So.2d at 1134. Therefore, we compelled arbitration.
The main opinion would distinguish Ard by suggesting that, because any rights asserted under the admission contract were cumulative to those provided in the AMLA, Wright could not assert any rights under the contract. However, Partin suggests that it is the "attempt[ ] to invoke" the contract that matters. Partin, 727 So.2d at 5. The inquiry is whether the plaintiff assented to the terms of the contract. Here, Wright admitted that there was a binding contract, and he attempted to sue under it. In this case, there would have been no breach-of-contract claims against Noland absent the contract that provided for Dorothy to be admitted into the nursing-home facility. See Ex parte Dyess, 709 So.2d 447, 451 (Ala.1997) (plurality opinion) ("Dyess's claims against American Hardware are so closely related to the insurance policy that Dyess must follow its terms even though he did not sign it. In addition, Dyess's claims would not exist but for the contract between Jack Ingram Motors and American Hardware."). Dorothy received the benefits of the contract because Noland provided nursing-home services to Dorothy pursuant to the admission contract. Further, both Dorothy and Wright brought the action on a breach-of-contract theory. Thus, like the plaintiffs in Partin and Ard, Dorothy and Wright have ratified and manifested their assent to the admission contract, and Wright cannot now "arbitrarily pick and choose between the provisions in the contract that [are] advantageous to him and the one provision he [thinks is] not  the arbitration provision." Delta Constr. Corp. v. Gooden, 714 So.2d 975, 981 (Ala. 1998).
Further, the mere assertion of a medical-malpractice claim does not, in itself, render void in its entirety a contract between the parties, including their agreement to arbitrate a future dispute. See, e.g., Owens v. Coosa Valley Health Care, Inc., 890 So.2d 983 (Ala.2004) (compelling the arbitration of a medical-malpractice action against a nursing home). Where there is a valid and binding arbitration agreement, as here, the question is whether the scope of the arbitration agreement covers the medical-malpractice claim. Dorothy's admission contract requires the arbitration of any "claim." The arbitration provision defines a "claim" as
"any controversy, dispute, cause of action, or claim now or hereafter existing . . . not limited to . . . any claim arising out of, relating to, or concerning this Agreement in any way, and/or the care or treatment of you in the Facility, whether in contract, tort, based on statute, equity, otherwise, including, but not limited to, negligence and wrongful death claims. . . . It is the intention of the parties to encompass within this provision and the term `Claim' the broadest possible scope of claims, controversies, disputes, and causes of action. . . . "
The language of the arbitration provision encompasses this medical-malpractice action. The claims in the complaint "aris[e] out of, relat[e] to, or concern . . . the care or treatment of [Dorothy] in the Facility." *696 Therefore, because Wright is bound by the admission contract, he must arbitrate Dorothy's medical-malpractice claim.
Had Wright in these circumstances brought only a breach-of-contract action and forgone the tort claim, even if the breach-of-contract claim had alleged only medical injury, I do not believe that there would be any doubt that under our caselaw he would be bound by the arbitration provision. The claim would have to comply with the AMLA's procedural and substantive requirements, but there is nothing in the AMLA that requires the plaintiff to pursue the claim under a particular legal theory. See § 6-5-542(2), Ala.Code 1975 ("This definition applies to all actions for injuries or damages or wrongful death whether in contract or tort. . . ."); Collins, 821 So.2d at 177 (holding that a plaintiff could bring an action for a medical injury under multiple legal theories). Yet, because Wright joined that breach-of-contract claim with a medical-malpractice claim, the main opinion, in effect, renders the contract void. There are therefore two implicit holdings of the main opinion: (1) that a plaintiff cannot bring an action based on a medical injury under the theory of breach of contract, and (2) that a party cannot contract for a standard of care higher than that specified in the AMLA.[1] The first proposition appears to contradict our holding in Collins, discussed above, and I am unaware of caselaw establishing the second proposition.
Dorothy Willis benefited from the admission contract, and her personal representative, Wright, expressly invokes that contract. Wright cannot now deny being bound by it. Because the arbitration provision of the contract encompasses this dispute, I believe that the trial court should have compelled arbitration; therefore, I respectfully dissent.
BOLIN, J., concurs.
NOTES
[1] Such a holding may violate the constitutional provisions prohibiting the impairment of contracts. See John E. Nowak & Ronald D. Rotunda, Constitutional Law 405 (4th ed.1991) (noting that the Contracts Clause in the United States Constitution restricts the power of state or local governments to substantially impair a contractual relationship unless the state law is narrowly tailored to promote a significant and legitimate public purpose).