BOLIN, Justice.
Diversicare Leasing Corp. d/b/a Canterbury Héalthcare Facility (“Canterbury”) appeals from an order denying its motion seeking to compel arbitration of a wrongful-death claim filed by Betty Hubbard, as the personal representative of the estate of Johnathan Bernard Hubbard. We affirm the order. -

Facts and History

Johnathan Bernard Hubbard was diagnosed with cerebral palsy when he was six months old, which caused him to bé developmentally delayed and to suffer from a seizure disorder. Betty Hubbard, Johnathan’s mother, testified that it was determined that Johnathan was “profoundly mentally retarded” and totally dependant upon others for his care. Betty stated that Johnathan could not walk and was confined to a wheelchair his entire life; that he could hot speak; that he could not feed, clean, or dress himself; that he had no use of his hands;- and that he could not otherwise communicate his needs to others. Betty Testified that Johnathan was like “an infant” and that he then progressed to the capacity of a “pre-toddler” and that that was as far as “his mental capacity went.”
Johnathan spent various periods of his life in residential-care facilities. He was first admitted to a residential-care facility when he was three years old, and he stayed at that facility for almost two years. Johnathan then returned home to live with his mother until he was approximately 11 *26 years old, at which time he returned to a residential-care facility for approximately 5 more years. Johnathan then returned home to live with his mother, where he remained until 2009 when he was admitted to Canterbury, a long-term-care nursing facility.
Betty was Johnathan’s sole custodial parent, and she made all health-care-related decisions for him. Betty executed all Medicare and Medicaid documents relative to Johnathan’s care and maintained a bank account on his behalf. Betty was the payee on all government-related health-care benefit checks received for Johnathan’s care, and she also received child support on behalf of Johnathan from Johnathan’s father. Betty testified that each residential facility in which Johnathan had resided looked to her for decision-making authority regarding Johnathan’s care. Betty further stated that the nurses and aides who treated Johnathan in her home when he resided with her also looked to her for decision-making authority regarding Johnathan’s care. Betty testified that at the time Johnathan was admitted to Canterbury he was unable to make decisions for himself and was unable to appoint another person to make decisions for him. In sum, Betty made all health-care decisions relating to Johnathan’s care and executed all documents in furtherance of that care.
In 2009, when Johnathan was 21 years old, Betty could no longer properly care for him at home, and she admitted Johnathan to Canterbury. Betty testified that she was “adamant about [Johnathan’s] getting care because he could not come home to me.”[1] Betty executed a number of documents upon Johnathan’s admission to Canterbury, including the admission agreement and the arbitration agreement made the basis of this appeal.
Section 1 of the admission agreement provided:
“This Admission Agreement (‘Agreement’) states the terms and conditions agreed to by you, Johnathan Hubbard, your Responsible Party, Betty Hubbard and Canterbury.
“In this Agreement ‘you’. and ‘your’ refers to.the person who wishes to become a resident, at the Facility, and the Facility refers to Canterbury.
“Your Responsible Party is your legal guardian, if one has been appointed, or your Attorney-in-Fact, if you have executed a power of attorney, or some other individual or family member who agrees to assist the Facility in providing for your healthcare and maintenance. The obligations of your Responsible Party are described more fully in this Agreement and in the Resident Handbook, both of which you and your Responsible Party should read carefully before signing this Agreement.”
The admission agreement contained a section entitled “Responsible Party,”. which provided , that “[t]he person signing this ■Agreement as your Responsible Party has the following relationship(s) to the Resident (please cheek all that apply) (If Legal Guardian, Attorney-In-Fact, Power of Attorney, Health Care Agent, etc., Responsible Party must provide documentation to that Effect.)” The admission agreement provided several relationship options from which to choose, including “spouse”; “relative”; “legal guardian”; “attorney-in-fact”; “friend or interested person”; and “other.” Betty checked the “relative” option; thereafter, Betty indicated her acceptance of the terms of the admission' agreement by *27 both initialing and signing the document in the space designated for the “Responsible Party.”[2]
Paragraph 3 of the arbitration agreement provided:.
“The claims or disputes covered by this Agreement shall include any action, dispute or claim of any kind between the Resident or Resident’s Representative, .Resident’s estate, successors, assigns, heirs, personal representatives, executors and administrators that relates in any way to healthcare services or any other items or services provided by [Canterbury], and agreements between the Resident and [Canterbury], or any other aspect of the past, present, or future relationships - between [Canterbury] and Resident. This agreement shall survive the death of the resident.”
Paragraph 4 of the arbitration agreement provides that “[a]ny and all disputes and claims described in paragraph 3 of this agreement shall be resolved by binding arbitration.” The arbitration agreement defines the “Resident’s -Representative” as
“the resident’s Legal Guardian, Attorney-in-Fact, Power of Attorney, or Health Care Sponsor. In the event a representative with such legal authority does not exist, the Resident may authorize a duly appointed person such as the Responsible Party to serve as his/her Representative and to sign this agreement on his/her behalf.”
The arbitration agreement defines the “Responsible Party” as “an individual or family member who agrees to assist [Canterbury] in providing for your healthcare and maintenance.” On the signature page of the arbitration agreement appeared three options as to how the resident could execute the arbitration, agreement. The first option consisted simply of a signature line for the resident and two signature lines for the required two witnesses. The second option provided as follows: “If Resident is unable to sign this Agreement because of physical disability, Resident must acknowledge consent to this Agreement and the acknowledgment shall be executed by two witnesses.” This phrase was followed by two witness lines. The third option provided as follows: “If Resident is unable to consent or sign this Agreement, this Agreement shall be executed by Resident’s Representative.” Betty' executed the document by signing her name on the line provided for the “Resident’s Representative.”
Johnathan was found unresponsive by the Canterbury staff on February 20, 2011, and was • transferred to a local hospital. Johnathan was diagnosed with sepsis; he died on February 21, 2011. On January 17," 2013, Betty petitioned the Probate Court of Russell County for letter^ of administration for .Johnathan’s estate’. On January 23, 2013, the probate court entered an order granting Betty’s petition for letters of administration and appointing her the administrator of Johnathan’s estate. On February 15, 2013, Betty, as the personal representative of Johnathan’s estate, sued Canterbury, asserting a wrongful-death claim. On March 22, 2013, Canterbury moved the trial court to compel arbitration of Betty’s wrongful-death claim and to stay the wrongful-death claim pending the arbitration. Betty argued in response to the motion to compel that she lacked the legal authority to bind Johnathan to the arbitration agreement because at the- time the agreement was executed *28 Johnathan was incapacitated and was 21 years old and had reached the age of majority, and she did not hold his power of attorney nor had she been appointed his personal representative or guardian by any court. Following a hearing, the trial court, on May 1, 2014, entered an order denying Canterbury’s motion to compel arbitration and to stay the proceedings. Canterbury appealed.

Standard of Review

This Court has stated:
“ ‘[T]he standard of review of a trial court’s ruling on a motion to compel arbitration at the instance of either party is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review.’ Ex parte Roberson, 749 So.2d 441, 446 (Ala.1999). Furthermore:
“ ‘A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id. “After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” ’
“Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1266 n. 1 (Ala.1995) (emphasis omitted)).”
Vann v. First Cmty. Credit Corp., 834 So.2d 751, 752-53 (Ala.2002).

Discussion

The dispositive issue on appeal is whether Canterbury has satisfied its burden of proving the existence of a contract calling for arbitration. More specifically, whether arbitration is enforceable in this case as to the wrongful-death claim asserted by Betty on behalf of Johnathan’s estate where, because of his incapacity, Johnathan did not sign the arbitration agreement. Generally, “a nonsignatory to an arbitration agreement cannot be forced to arbitrate [her] claims.” Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001). However, as with most general rules, there are exceptions. Justice Stuart has noted that this “Court has created a distinct body of caselaw considering specifically the issue how and when arbitration agreements executed by the owners and operators of nursing homes and their residents and/or their residents’ family members should be enforced.” SSC Montgomery Cedar Crest Operating Co. v. Bolding, 130 So.3d 1194, 1196 (Ala.2013). See also Owens v. Coosa Valley Health Care, Inc., 890 So.2d 983 (Ala.2004); Briarcliff Nursing Home, Inc. v. Turcotte, 894 So.2d 661 (Ala.2004); Noland Health Servs., Inc. v. Wright, 971 So.2d 681 (Ala.2007); Carraway v. Beverly Enters. Alabama, Inc., 978 So.2d 27 (Ala.2007); and Tennessee Health Mgmt., Inc. v. Johnson, 49 So.3d 175 (Ala.2010). Justice Stuart, citing the decision of the United States Court of Appeals for the Eleventh Circuit in Entrekin v. Internal Medicine Associates of Dothan, P.A., 689 F.3d 1248, 1259 (11th Cir.2012), further noted that that court had reviewed the above-mentioned caselaw and correctly concluded “that the principle to be extracted from these cases is that an arbitration agreement that binds the nursing-home resident also binds the resident’s representative.” Bolding, 130 So.3d at 1196. Therefore, it is that principle that we will apply in de *29 termining the issues presented in this appeal.
Canterbury' argues on appeal that the arbitration agreement is enforceable as to Johnathan because, it says, Betty had the authority, as Johnathan’s parent, to act on his behalf and thus bound Johnathan to the arbitration agreement when she executed it as the “Resident’s Representative.”- Further, Canterbury also argues that Betty herself is bound by the arbitration agreement because she signed ' the agreement as the “Resident’s Representative” and subsequently brought the wrongful-death claim as the personal representative of Johnathan’s estate. Thus, Canterbury contends that Betty, as a signatory to the arbitration agreement, has bound herself to the arbitration agreement and must submit the wrongful-death claim to arbitration.
Betty responds by arguing that Canterbury has failed to establish the existence of a binding arbitration agreement because, she says, her signature on the arbitration agreement was ineffective to bind Johnathan' in that she did not have the proper legal authority to bind Johnathan. Betty contends that Johnathan was an incapacitated adult and that at the time he was admitted to Canterbury she had not been given his power of attorney and had not been previously appointed by a court of competent jurisdiction as his guardian or conservator or otherwise to handle his affairs. Betty also argues that the arbitration agreement is void on the ground that it is unconscionable. We address these arguments in ton.
In Owens, supra, the nursing-home resident was admitted to the nursing home following a two-week hospitalization for heart failure. The resident signed no admission papers upon being admitted to the nursing home. Rather, the resident’s admission to the nursing-home-was handled by her daughter, who signed the relevant admission documents as the resident’s guardian and sponsor. One of the admission documents contained an arbitration agreement. Subsequently, the resident sued the nursing home, alleging that it had failed to provide adequate care. . Following the resident’s death, her daughter, as administrator of the resident’^ estate, was substituted as the plaintiff. The nursing home filed a motion to stay the proceedings and to compel arbitration. The trial court granted the motion to compel arbitration.
The daughter argued on appeal, among other things, that the trial court erred in granting the nursing home’s motion to compel arbitration because the resident did not sign the arbitration agreement and therefore should not be bound by it. In holding that the nursing-home resident was bound by the arbitration agreement, this Court stated:
“[I]t is undisputed that [the daughter], on behalf of [the resident], entered into the arbitration agreement with [the nursing home]. -The agreement explicitly states that it is ‘between [the nursing home].... -and the undersigned Patient, Guardian and Sponsor (hereinafter known as “Patient”).’ [The resident] is clearly designated on the signature page as the ‘Patient’; [the daughter] is clearly designated on the signature page as both ‘Guardian’ and ‘Sponsor’; and the agreement states that ‘[t]he meaning of “Patient” shall include Patient and his, her or their sponsors, guardians, heirs, executors, successors, and assigns.’ There is no evidence indicating that [the resident] had any objection to [the daughter’s] acting on her behalf in admitting [the resident] to the nursing home. • [The nursing home] has met its burden of proving the existence of a contract between [the nursing home] *30 and [the resident] calling for arbitration.”
Owens, 890 So.2d at 987. Nothing in Owens- indicated that the resident was in anyway mentally incapacitated. Further, important to this Court’s analysis in Owens was the fact that the evidence indicated that the resident had no objection to her daughter’s, acting on her behalf.
In Briarcliff, supra, Noella Turcotte and Sarah Carter were admitted to the Briar-cliff nursing home. David Turcotte and Kyra Woodman completed the admission documents on behalf of Noella and Sarah, respectively; one document included an arbitration agreement.. David signed the admission agreement for Noella in his capacity as “Fiduciary Party.” Kyra signed the admission agreement relating to Sarah in her capacities as “Fiduciary Party” and “Attorney-In-Fact under [a] validly executed power of attorney.” Subsequently, David and Kyra, in their capacities as the personal representatives of the estates of Noella and Sarah, separately sued Briar-cliff for the alleged wrongful deaths of Noella and Sarah. Briarcliff moved to compel arbitration on the ground that agents for Noella and Sarah had signed admission contracts that contained an arbitration provision. David and Kyra opposed the motions to compel arbitration, arguing that neither of them, in their capacities as executor and administratrix, respectively, of the deceased estates had signed or had otherwise entered into the admission contracts and that the “fiduciary parties” who signed the admission contracts on behalf of Noella and Sarah while they were alive could not contractually bind the then nonexistent wrongful-death claims to arbitration. The trial court denied Briarcliff s motions , to compel arbitration. Briarcliff filed separate appeals, and this Court consolidated the appeals because they raised identical issues.
In concluding that David and Kyra, in their capacities as the personal representatives, of the estates of Noella and Sarah, were bound to arbitrate the wrongful-death claims, this Court stated:
“In SouthTrust Bank [v. Ford, 835 So.2d 990 (Ala.2002)], the underlying dispute involved SouthTrust’s negligent cashing of a check on Edwin Edwards’s account. Edwards died before- the dispute was resolved, and Melody Ford, his daughter, as the administratrix of Edwards’s estate, sued SouthTrust alleging that it had negligently cashed the check. She also sued SouthTrust in her individual capacity, asserting related claims. The deposit agreement that governed Edwards’s account at SouthTrust contained an arbitration provision. On the basis of that provision, SouthTrust moved to compel arbitration; the trial court denied the motion. SouthTrust appealed, and- this Court found that ‘Melody’s, claim to recover the value of the. improperly paid check is subject to arbitration because she is asserting that claim in her role as the administratrix of Edwards’s estate.’ Id. at 994. We further stated:
“ ‘We recognize that an administra-trix of a decedent’s estate stands in the shoes of the decedent. <‘We also recognize - that, the “[p]oWers [of an executor], in collecting the debts constituting the assets of the estate, are just as broad as those of the ■ deceased.” -For the same reason the powers of an executor or an administrator encompasses all of those formerly held by the decedent, those powers must likewise be restricted in the same manner and to the same extent as the powers of the decedent would have been. Thus, where an executor or administrator asserts a claim on behalf of the estate, he or she *31 must also abide by the terms of any valid agreement, including an arbitration agreement, entered.into by the decedent.’
“Id. at 993-94 (citations omitted). Therefore, in this case, Turcotte, as executor of Noella’s estate, and Woodman, as administratrix of Sarah’s estate, are bound by the arbitration provisions contained in the admission contracts.”
Briarcliff, 894 So.2d at 664-65. Again, nothing in Briarclijf indicated that the nursing-home residents were mentally incapacitated and not capable of acquiescing to the individuals’ acting on their behalf by signing the admitting documents and binding the residents to the arbitration provision.
This Court next decided Noland Health, supra, a plurality opinion," in which the resident, who was suffering from dementia related to Alzheimer’s disease, was admitted to "the nursing home while accompanied by her daughter-in-law. The resident’s daughter-in-law completed the admission agreement on the resident’s behalf. The admission agreement contained an arbitration provision. The admission agreement had a page that contained blank spaces for identification of the parties. In the space for identifying the “Resident,” the daughter-in-law wrote in the resident’s name. The space designated for “Resident’s Legal Representative (if applicable)” was left blank. The space designated for the “Resident’s Responsible Party (if applicable)” was signed by the daughter-in-law. The last page of the agreement, the signature page, contained lines with the identical designations. The spaces designated for the signatures of the “Resident” and the “Resident’s Legal Representative (if applicable)” were left blank. The daughter-in-law signed in the space designated for the “Residents Responsible Party (if applicable).”
Subsequently, the resident fell on a couple- of occasions and suffered injuries to' her hip and neck. In January 2005, a complaint was filed against the nursing home by. the resident individually, and by her son and daughter-in-law as her next friends, alleging that she had received negligent and substandard-care and treatment at the nursing home. The resident died in February 2005. Thereafter, Peter Wright, as administrator of the resident’s estate, amended the complaint to add a wrongful-death claim. The nursing home moved to compel arbitration; the trial court denied the motion. ,
The nursing home appealed, arguing that the arbitration provision was enforceable1 against Wright as 'the resident’s personal representative, notwithstanding the fact that the resident did not personally sign the admission agreemént because, it said, the resident’s daughter-in-law1 had signed the admission agreement on the resident’s behalf as the “responsible party.” Wright, however, argued that the daughter-in-law’s signature on the agreement as the “responsible party” was ineffective to bind the resident to the arbitration provision in the agreement.
In concluding that the admission agreement signed by the resident’s daughter-in-law did not bind the resident, a plurality of this Court explained:
“It ‘ is undisputed that when [the daughter-in-law] was given the option to sign the agreement as a ‘responsible party’ or as a ‘legal representative,’ she chose the former option. The agreement explained that ‘[a] Legal Representative is an individual who, under independent legal authority, such as a court order[,] has authorityto act on the Resident’s behalf and listed ‘a guardian, a conservator,- and the holder of a Dura *32 ble Power of Attorney executed by the Resident’ as examples of legal representatives.
“Wright contends that at the time of [the resident’s] admission to the nursing home, [the daughter-in-law] ‘did not hold power of attorney for [the resident], was not her guardian, and had never been appointed by [the resident] or by a court of competent jurisdiction to handle the affairs’ of her mother-in-law-
[[Image here]]
“... [I]n executing the agreement [the daughter-in-law] did not sign [the resident’s] name in any purported capacity and did not purport to be [the resident’s] legal representative. [The daughter-in-law’s] signatory role was, therefore, effectively that of a ‘next friend,’ who ‘voluntarily agree[d] to hon- or certain specified obligations’ of her mother-in-law_It has long been established in this State, however, that one who purports to act merely as a ‘next friend’ of a ‘non compos mentis’ is ‘wholly without authority to make any contract that would bind her or her estate.’ Page v. Louisville & Nashville R.R., 129 Ala. 232, 238, 29 So. 676, 678 (1901).
“In that connection, the trial court found that ‘[the resident] was not competent at the time her daughter-in-law signed the contract of admission in this case.’ ... Indeed, there is no. conflict in the evidence, which includes medical reports as to [the resident’s] mental capacity. One such report describes [the resident] ‘an 86 year old demented female’ ... who was ‘[n]ot oriented to person, place or time.’ In another medical report, she is described as ‘always confused.’ Thus, we conclude that [the daughter-in-law’s] signature in the capacity of a next friend, or ‘responsible party,’ was ineffective to bind [the resident] or her personal representative to the agreement.”
Noland, 971 So.2d at 685-86 (emphasis omitted).
The decision in Noland is clearly distinguishable from the decisions in Briarcliff and Owens, in that the resident in Noland was mentally incapacitated and could not consent to her daughter-in-law, who had not been appointed her legal representative, acting on her behalf by signing the admission documents and thereby binding her to the arbitration provision contained in the admission agreement. The residents in both Briarcliff and Owens did not suffer from any mental incapacities or infirmities that prevented them from acquiescing to individuals’ acting on their behalf in executing the admission documents that bound them to the arbitration provision.[3] This distinguishing factor is further highlighted in subsequent cases decided by this Court.
In Carraway, supra, Richard Carraway executed a number of documents on behalf of his sister, Shirley Carraway, as her authorized representative when she was admitted to a nursing home. Shortly after she was admitted as a resident into the nursing home, Shirley executed a durable power of attorney, naming Richard as her attorney-in-fact. Shirley subsequently died, and Richard brought a wrongful-death claim against the nursing home. The nursing home moved the trial court to *33 compel arbitration, and the trial court granted the motion. Richard appealed.
Richard argued on appeal that the nursing home had failed to establish the existence of a valid arbitration agreement between Shirley and the nursing home because Shirley did not sign the arbitration agreement herself. In concluding that a binding arbitration agreement existed between Shirley and the nursing home even though Shirley did not sign the agreement, this Court stated:
“Just as Richard signed all the other documents relating to Shirley’s admission into the nursing home on Shirley’s behalf, Richard signed the arbitration agreement on Shirley’s behalf expressly as an ‘authorized representative.’ Apparent authority ⅛ implied where the principal passively permits the agent to appear to a third person to have the authority to act on [her] behalf.’. Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc., 426 So.2d 859, 861 (Ala.Civ.App.1983). ‘It is not essential that the right of control be exercised so long as that right actually exists.’ Wood Chevrolet Co. v. Bank of the Southeast, 352 So.2d 1350, 1352 (Ala.1977). There is no evidence indicating that Shirley had any objection to Richard’s acting on her behalf in admitting Shirley to the nursing home. On the contrary, the evidence suggests that Shirley approved of her brother’s acting on her behalf. A few weeks into Shirley’s residency at the nursing home, she executed a power of attorney, giving Richard further authority to act on her behalf. The arbitration agreement did not call for the signature of a legal representative; instead, it provided that ‘a person duly authorized by the Resident’ could sign the agreement on the resident’s behalf.”
Carraway, 978 So.2d at 30-31.
In Johnson, supra, Dolores J. Rousseau was admitted to a nursing home on January 26, 2008, following hip-replacement surgery. Barbara Rousseau, Dolores’s daughter, signed'numerous forms, including an arbitration agreement, on Dolores’s behalf upon her admittance to the nursing home. Barbara .signed the admission forms in the various capacities of the patient’s representative, the patient or a responsible party, the resident’s representative; the resident/fainily, the family or legal representative, the legal representative, or the responsible family member. Dolores never objected to Barbara’s signing the various admission forms on her behalf, and there was nothing to indicate that Dolores was mentally incompetent when she was admitted to the nursing home. Dolores was discharged from the nursing home six days later on February 1, 2008.
On May 23, 2008, Dolores, acting through Barbara as her next friend, sued the nursing home, alleging negligence, wantonness, and breach of contract. Dolores. alleged that while she was a resident of the nursing home she suffered dehydration, a urinary-tract infection, an abdominal blockage, and other bodily injuries, as well as mental anguish and emotional distress. The nursing home moved to compel arbitration. Dolores opposed the motion to compel arbitration, arguing that Barbara did not have a power of attorney over her and had no any other legal basis for signing her name'to the various admission documents; that Barbara signed the admitting paperwork in her individual capacity; and that Dolores did not sign the admitting paperwork and did not direct Barbara to sign the paperwork. The trial court denied, the motion to compel arbitration. In June 2008, Dolores died, and another daughter, Carol J. Rousseau Johnson, as Dolores’s personal representative, amended the complaint to add a wrongful- *34 death claim against the nursing home. The nursing home renewed its motion to compel arbitration, which the trial court again denied.
The nursing home argued on appeal that Barbara had the apparent authority to sign the arbitration agreement for Dolores because, it argued,.-Barbara had represented herself on the admission documents as someone who had the legal authority to bind Dolores and because Dolores did not object to Barbara’s signing the admission documents on her behalf. Carol argued, among other things, that Dolores was not bound by the arbitration agreement because she did not sign it. In holding that Dolores was bound to the arbitration agreement signed on her ,behalf by. Barbara, this Court explained:
“Carol also argues that Dolores is not bound by the ADR [alternative dispute resolution] agreement because she did not sign it and she was not present when Barbara signed'it. Barbara’s claims, if any, may be subject to arbitration, Carol argues,- but' as a nonsignatory to the agreement, Dolores could not be forced to arbitrate her claims. Carol relies upon Noland Health Services, Inc. v. Wright, 971 So.2d 681 (Ala.2007). In Noland, a plurality of this Court held that a daughter-in-law’s signature as the responsible party on a mirsing-home arbitration agreement was ineffective to bind' the resident to the agreement. Noland is distinguishable from this case, however, because the nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf and because the daughter-in-law did not sign any document in the capacity of her mother-in-law’s legal representative.”
49 So.3d at 180-81 (emphasis added). Thus, Dolores was bound to the arbitration agreement, despite •not actually having signed the arbitration agreement, because she was mentally competent and capable .of authorizing Barbara to act on her behalf in signing the agreement.
In Bolding, supra, also a plurality opinion, Norton Means was admitted to a nursing home for rehabilitation and nursing services while he recovered from stroke and/or heart-attack-like symptoms. Means was accompanied by his daughter, Michelle Pleasant, who completed the admitting paperwork on his behalf. Among the paperwork completed and signed by Pleasant was an arbitration agreement. Pleasant signed her name on the arbitration agreement on a line indicated for the “Signature of Legal Representative or Family Member.” Subsequently, Means was readmitted to the hospital. Linda Bolding, another of Means’s daughters to whom he had previously granted a durable power of attorney, sued the nursing home alleging that the nursing home had negligently cared for Means, resulting in his suffering dehydration, malnourishment, and an untreatéd infection that resulted in his readmission to the hospital. The nursing home moved to compel arbitration pursuant to the terms of the arbitration agreement. Bolding responded by arguing that the arbitration agreement was unenforceable as to Means because Pleasant had no legal authority to act on his behalf at the time she executed the arbitration agreement. The trial court entered an order denying the motion to compel arbitration. The nursing home appealed. , ,.
In affirming the denial of the motion to compel arbitration and holding that the arbitration agreement signed by Pleasant on behalf of Means was ineffective to bind Means, Justice Stuart aptly explained the distinguishing principle between arbitration agreements signed on behalf of competent nursing-home residents and arbi *35 tration agreements signed on behalf of mentally incompetent nursing-home residents, making clear this Court’s treatment of the two:
“The only evidence before the Court in this case indicates that Means was mentally incompetent when he was admitted to [the nursing home] and the DRA [dispute resolution agreement] was executed; indeed, [the nursing home] does not even argue that he was competent at any relevant time....
“Children and the mentally incompetent have traditionally been treated differently under the law than the standard competent adult. See, e.g., Ex parte E.R.G., 73 So.3d 634, 678 (Ala.2011) (Main, J., dissenting) (‘The state necessarily injects itself into the affairs of children and the mentally incompetent when they are in need of protection because their developmental differences and their environmental restraints render them more vulnerable than competent adults.’). And, while we have held that competent residents of nursing homes may be bound by arbitration agreements executed by their representatives, see, e.g., Carraway, 978 So.2d at 30-31, and Johnson, 49 So.3d at 176, our cases also indicate that incompetent residents are not so bound.' In Noland Health Services, we considered whether the administrator of Dorothy Willis’s estate was bound to' arbitrate personal-injury and wrongful-death claims stemming from Dorothy’s treatment at a nursing home pursuant to an arbitration provision in a contract executed by Dorothy’s daughter-in-law, Vicky Willis, when Dorothy was admitted to the nursing home. 971 So.2d at 683. A plurality of the Court agreed with the trial court’s finding that Dorothy was incompetent when the contract was signed and that Vicky’s signature as the ‘responsible party’ or next friend on that .contract “was ineffective to bind Dorothy or her personal representative to the agreement.’ 971 So.2d at 686. In support of that conclusion, the plurality opinion quoted Page v. Louisville & Nashville R.R., 129 Ala. 232, 238, 29 So. 676, 678 (1901), for the proposition that ‘one who purports to act merely as a “next friend” of a “non. compos mentis” is “wholly without authority to make any contract that would bind her or her estate.”’ Noland Health Servs., 971 So.2d at 686.
“Of course, Noland Health Services was a plurality opinion, and its prece-dential value is accordingly limited. Ex parte Achenbach, 783 So.2d 4, 7 (Ala.2000). However, this Court subsequently recognized the principle for which Noland Health Sewices is now cited in Johnson. In Johnson, Tennessee Health Management (‘THM’) appealed the deniál of its motion to enforce an arbitration agreement against Carol Rousseau Johnson, who was prosecuting personal-injury and wrongful-death claims against THM in her capacity as the personal representative of the estate of Dolores Rousseau, who allegedly was injured while a resident of a nursing home operated by THM. 49 So.3d at 176. When Dolores was admitted' to that nursing home, her daughter Barbara Rousseau had signed an arbitration agreement with THM, but ‘[t]here is no evidence indicating that Dolores ... was mentally incompetent when she was ad-mitted_’ 49 So.3d at 176-77. Citing Noland Health Services, Carol subsequently argued to this Court that Dolores was not bound by the arbitration agreement because she had not signed it. 49 So.3d at 180. This Court rejected her argument, distinguishing Noland Health Services as follows:
“ ‘Carol relies upon Noland Health Services, Inc. v. Wright, 971 So.2d 681 *36 (Ala.2007). In Noland, a plurality of this Court held that a daughter-in-law’s signature as the responsible party on a nursing-home arbitration agreement was ineffective to bind the resident to the agreement. Noland is distinguishable from this case, however, because the nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf and because the daughter-in-law did not sign any document in the capacity of her mother-in-law’s legal representative.’
“Johnson, 49 So.3d at 180-81. We thereafter held that the arbitration agreement executed by Barbara did bind Dolores and was therefore enforceable against Carol, thus recognizing the distinction between arbitration agreements signed on behalf of nursing-home residents who are incompetent and those signed on behalf of nursing-home residents who are competent. 49 So.3d at 181.
“[The nursing home] argues that No-land Health Services is distinguishable inasmuch as Vicky Willis did not sign the contract containing the arbitration provision in Noland Health Services as Dorothy’s legal representative, while, [the nursing home] asserts, Pleasant did sign the DRA as Means’s legal representative. We disagree, however, with [the nursing home’s] assertion that Pleasant signed the DRA as Means’s legal representative. The signature block on the DRA indicates that Pleasant signed the DRA as ‘Legal Representative or Family Member.’ (Emphasis added.) Moreover, although the paragraph above the signature line indicates that the signer of the document is asserting that he or she has ‘the authority to sign the agreement on [the resident’s] behalf,’ merely claiming to have legal authority on someone else’s behalf or claiming to be someone else’s legal representative does not make it so. It is undisputed that Pleasant has never held a power of attorney for Means, and she also stated in an affidavit submitted to the trial court that she was granted ‘no legal authority by him or anyone else to enter into the [DRA] on his behalf.’
“[The nursing home] argues in the alternative that the doctrine of apparent authority should nevertheless bind Means, and by extension Bolding, to the DRA. In Carraway, we applied the doctrine of apparent authority to hold that Shirley Carraway, a nursing-home resident, was bound by an arbitration agreement signed by her brother Richard Carraway:
“ ‘Just as Richard signed all the other documents relating to Shirley’s admission into the nursing home on Shirley’s behalf, Richard signed the arbitration agreement on Shirley’s behalf expressly as an “authorized representative.” Apparent authority “is implied where the principal passively permits the agent to appear to a third person to have the authority to act on [her] behalf.” Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc., 426 So.2d 859, 861 (Ala.Civ.App.1983). “It is not essential that the right of control be exercised so long as that right actually exists.” Wood Chevrolet Co. v. Bank of the Southeast, 352 So.2d 1350, 1352 (Ala.1977). There is no evidence indicating that Shirley had any objection to Richard’s acting on her behalf in admitting Shirley to the nursing home. On the contrary, the evidence suggests that Shirley approved of her brother’s acting on her behalf. A few weeks into Shirley’s residency at the nursing home, she executed a power of attorney, giving *37 Richard further authority to act on her behalf.’
“978 So.2d at 30-31. We likewise applied the doctrine of apparent authority in Johnson, stating that Dolores ‘passively permitted Barbara to appear to THM to have the authority to act on her behalf, and Barbara’s apparent authority is, therefore, implied.' 49 So.3d at 180. However, in both Carraway and Johnson the nursing-home resident was competent and effectively acquiesced to and/or ratified the decisions made by their respective representative, thus making the application .of the apparent-authority doctrine appropriate.
“In contrast, the only evidence in the record in this case indicates that Means is incompetent and thus unable to empower an agent, whether. passively or through affirmative acts. See Johnson, 49 So.3d at 180-81 (‘[T]he nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf_’). Thus, at best Pleasant may have purported to be Means’s legal representative, but that is an insufficient basis upon which to apply the doctrine of apparent authority. Northington v. Dairyland Ins. Co., 445 So.2d 283, 286 (Ala.1984) (‘[I]n order for a principal to be held liable under the doctrine of apparent authority and es-toppel, the principal must have engaged in some conduct which led a third party to believe that the agent had authority to act for the principal.’ (emphasis added)). See also Gray v. Great American Reserve Ins. Co., 495 So.2d 602, 607 (Ala.1986) (noting that one cannot ‘blindly trust’ another’s statements regarding the extent of his or her agent power), and City Stores Co. v. Williams, 287 Ala. 385, 391, 252 So.2d 45, 51 (1971) (‘The burden of proving agency rests upon the party asserting it.’).
“In conclusion, we hold that Means was not bound'by the DRA'executed by Pleasant; therefore, Bolding was not bound.. However, we emphasize that this conclusion is not reached became Means did not personally execute the DRA. Rather, it is because all the evidence in the record indicates that Means is incompetent. Thus, while Bolding, as the holder of a durable power of attorney granted by Means, may have been able to bind him to an arbitration agreement, Pleasant, as merely a family member or next friend, could not.”
Bolding, 130 So.3d at 1196-99 (final emphasis added).
Here, it is undisputed that at the time Johnathan was admitted to Canterbury he was 21 years old[4] and mentally incompetent. All the evidence indicates that Johnathan had the mental capacity of “an infant” of a “toddler” and that he was totally dependant upon others for his care because he was confined to a wheelchair; he had no use of his hands; he could not speak; and he could not feed, clean, or dress himself. Because Johnathan was mentally incompetent at the time Betty executed the arbitration agreement, he cannot be bound to the agreement since he was incapable of authorizing or empowering Betty to act on his behalf. Bolding, supra; Noland, supra; and Johnson, supra.
Furthermore, Betty was without the legal authority or capacity to bind Johnathan to the arbitration agreement. The arbitration agreement provided that “[i]f *38 [the] Resident is unable- to consent or sign this Agreement, this Agreement shall be executed by [the] Resident’s.Representative.” The arbitration agreement defined the “Resident’s Representative” as
“the resident’s Legal Guardian, Attorney-in-Fact, Power of Attorney, or Health Care Sponsor. In the event a representative with such legal authority does not exist, the Resident may authorize a duly.appointed person such as the Responsible Party[5] to serve as his/her Representative and to sign this agreement on his/her behalf.”
(Emphasis added.) Betty executed the arbitration agreement by signing her name as the “Resident’s Representative.” It is undisputed that, once Johnathan had reached the age of majority, .Betty had never been given Johnathan’s power of attorney, health-care sponsorship, or attorney-in-fact and that she had not been appointed by a court of competent jurisdiction as his legal guardian, conservator, or the holder of. any protective orders.[6] Thus, according to the express terms of the arbitration agreement, in order for Betty to .act on Johnathan’s behalf and to sign the arbitration agreement he was required to “authorize a duly appointed person such as the Responsible Party to serve as his/her Representative.” As discussed above, it is undisputed that Johnathan was mentally incompetent and was incapable of authorizing Betty to act on his behalf. Thus, Betty did not bind Johnathan to the arbitration agreement by signing it in her capacity as the “Resident’s Representative.” Bolding, supra; Noland, supra; and Johnson, supra.
Accordingly, we agree with the reasoning in Noland and Bolding, as well as the holding in Johnson, and we conclude that Johnathan could not be bound to the arbitration agreement because he was mental *39 ly incompetent and incapable of authorizing Betty, who did not otherwise hold or possess the proper legal authority, to act on his behalf in executing the arbitration agreement.
Relying upon the decision in Wells Fargo Bank, N.A. v. Chapman, 90 So.3d 774 (Ala.Civ.App.2012), Canterbury next argues that because Betty was a signatory to. the arbitration agreement in the capacity of Johnathan’s “Resident Representative,” she is now bound to the agreement in her capacity as Johnathan’s personal representative. Thus, Canterbury contends, the wrongful-death claim brought by Betty on behalf of Johnathan’s estate must be submitted to arbitration. We disagree.
In Chapman, a father, as the administrator of his daughter’s estate, brought a wrongful-death action against a bank alleging that the bank impermissibly had allowed the daughter to access funds held in a certifícate of deposit (“CD”) — which the father held in his name as the custodian for the daughter — that she then used to purchase illegal drugs on which she eventually overdosed and died. The bank moved the trial court to compel arbitration on the basis that the father was a signatory to an arbitration agreement that was executed in conjunction with the issuance of the CD. The trial court denied the motion to compel arbitration, and the bank appealed. The father argued, among other things, that, he was. not required to •submit the wrongful-death claim to arbitration because, he said, the arbitration agreement did not apply to the wrongful-death claim since that claim was not his daughter’s to assert, and, therefore, she could not agree to arbitrate that claim. Chapman, supra. In concluding that the father, as the administrator of the daughter’s estate, must submit the wrongful-death claim to arbitration, the Court of Civil Appeals explained:
“We assume that [the father] advances this argument because [he] contends that he did not sign the South-Trust signature card and that he is therefore not bound by the SouthTrust arbitration agreement. We have concluded that the evidence establishes that [the father] did sign the signature card, however; therefore, we need not determine whether Carraway and [Briar-cliff] stand for the proposition that a decedent may agree to arbitrate a wrongful-death claim arising from his or her own death. Instead, we may rely on [the father’s] being a signatory to the SouthTrust arbitration agreement to compel him to arbitrate the wrongful-death claim like the personal representatives in Carraway and [Briarcliff].”
Chapman, 90 So.3d at 782. Thus, because the evidence indicated that the father had previously signed the arbitration agreement, the Court of Civil Appeals concluded that the father was bound to arbitrate the wrongful-death claim asserted in the father’s representative capacity as the administrator of his daughter’s estate. This conclusion represents a misapprehension of the foregoing caselaw, which defined the principle that an arbitration agreement that binds.- a nursing-home resident also binds the resident’s representative. Bolding, supra.[7]
As mentioned earlier, in holding that the personal representative was not required to submit the wrongful-death claim to arbitration, the Noland plurality distinguished that case from Briarcliff on a second ground, noting that the executors in Briar-cliff were signatories to the arbitration *40 agreement, whereas the executor in No-land had not signed the arbitration agreement. The conclusion drawn was that, where an individual has previously signed an arbitration agreement on behalf of a nursing-home resident and then subsequently brings a wrongful-death claim on behalf of that nursing-home resident in the individual’s capacity as the nursing-home resident’s personal representative, that individual could be bound to the arbitration agreement he or she signed before the nursing-home resident’s death and his or her appointment as the personal representative.
In Entrekin, the United States Court of Appeals for the Eleventh Circuit explained how the second ground upon which No-land was distinguished from Briarcliff is contrary to the principle that an arbitration agreement that binds a nursing-home resident also binds the resident’s representative, a principle this Court has defined from the body of caselaw specifically addressing the issue of how and when arbitration agreements are binding upon nursing-home residents and their family members. The Entrekin court explained:
“This part of the Noland plurality opinion, the positing of a second distinction between that case and the Briarcliff and Carraway cases, is where the wrinkle arises. That second distinction appears to rest on the novel premise that an agent who signs a contract on behalf of a principal binds not only the principal but also the agent himself in another capacity — even if the agent has not yet acquired that other capacity (e.g., an executor who is not yet an executor because the decedent-to-be is not yet deceased). That is the same premise that the district court relied on in denying Westside Terrace’s motion to compel arbitration. Applying that premise here would lead to the conclusion that the executor is not bound by the agreement that Entrekin signed because the executor himself did not sign it.
“We are not bound to apply that premise from the Noland plurality opinion, however, because it is only a plurality opinion....
[[Image here]]
“Not only that, but a later decision of the Alabama Supreme Court vitiated whatever persuasive value the second premise of the Noland plurality opinion might otherwise have had. The case is Tennessee Health Management, Inc. v. Johnson, 49 So.3d 175 (Ala.2010). A daughter, acting as her mother’s personal and legal representative, signed all nursing home admissions forms on her mother’s behalf. Id. at 176. The daughter later sued the nursing home on her mother’s behalf alleging that her mother suffered various injuries during her stay at the nursing home. Id. at 177. The mother died while that lawsuit was pending, and a different daughter became the executor of the mother’s estate. Compare id. at 176 (identifying ‘Barbara Rousseau’ as the pre-mortem personal representative who signed the arbitration agreement), with id. at 178 (identifying ‘Carol J. Rousseau Johnson’ as the executor of the estate). As executor, that different daughter filed an amended complaint against the nursing home, adding a wrongful death claim alleging that the various injuries ‘resulted in [the resident’s] death.’ Id. at 178. When the nursing home moved to compel arbitration, the executor objected on the ground that the decedent was ‘not bound by the [arbitration] agreement’ because she had not signed it and ‘was not present’ when her daughter signed it on her behalf, as her personal and legal representative. Id. at 180.
*41 “Relying on the Carraway decision, which followed the simple rule from Briarcliff that an arbitration agreement that binds a decedent binds the executor of her estate, the Alabama Supreme Court in Johnson quickly disposed of the executor’s argument. See id, at 181. It held that one reason the decedent was bound by the arbitration agreement was that her daughter had signed it on her behalf as her legal representative. Id. The Court distinguished the Noland case ‘because the nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf and because the daughter-in-law did not sign any document in the capacity of her mother-in-law’s legal representative.’ Id. at 180-81. In the case before it, the Johnson Court concluded that the daughter who signed the nursing home admission forms, including the arbitration agreement, ‘had the apparent authority to bind [her mother]’ when she signed those documents because the evidence showed that the mother ‘passively permitted [her daughter] to act on her behalf.’ Id. at 181.
“Because the signature of the daughter as pre-mortem personal representative of the mother bound the mother to the contract in Johnson, there was ‘a valid contract calling for arbitration’ between the decedent and the nursing home. Id. And because there was a valid contract between the decedent and the nursing home calling for arbitration, ‘[t]he trial court erred in denying the motion to compel arbitration’ of the wrongful death and other .claims brought by the executor (a different daughter, who never signed the agreement in any capacity). Id.
“The Alabama Supreme Court’s reasoning in Johnson mirrors its reasoning in Briarcliff and Carraway: the executors in each case had to arbitrate the wrongful death claim because there was a valid arbitration agreement between the decedent and the nursing home. That reasoning and those holdings are inconsistent with the second premise articulated in the Noland plurality opinion, which is that executors who sign an arbitration agreement on behalf of a resident are bound by the agreement as executors but those who do not sign it on behalf of a resident are not. In Johnson the executor did not sign the arbitration agreement in any capacity and thus was not a ‘signatory personal representative,’ .yet the Alabama Supreme Court compelled arbitration of the claims anyway. And we are compelled to follow its holdings and compel arbitration of the wrongful death claim in this case.”
Entrekin, 689 F.3d at 1257-59 (emphasis added). We agree with the Entrekin court’s conclusion that the second premise set forth in Noland — that personal representatives of the estates of deceased nursing-home residents who happened to also have signed arbitration agreements on behalf of those residents are bound by those agreements in their capacities as personal representatives but that .those personal representatives who have not signed an arbitration agreement on behalf of deceased nursing-home residents are not so bound — is inconsistent with the rather simple principle carved from the caselaw in this area that, if a deceased nursing-home resident was bound to an arbitration agreement, so too would be the personal representative of that resident’s estate regardless of whether that personal representative was a signatory to the arbitration agreement in some capacity other than the resident’s legal representative. Accordingly, we conclude that Betty cannot be bound to the arbitration agreement in her capacity as the personal representative of *42 Johnathan’s estate when she signed the arbitration agreement in what amounts to her capacity as ■ Johnathan’s relative or next friend.

Conclusion

Based on the foregoing, we affirm the trial court’s decision to deny the motion to compel arbitration.
AFFIRMED.
STUART, PARKER, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.
MOORE, C.J., and BRYAN, J., concur in the result.

. Johnathan had been hospitalized for approximately 20 days at the time Betty decided ' to admit him to Canterbury.

. Betty also signed other documents appended to the admission agreement as part of Johnathan’s admission to Canterbury, including a patient-account fund authorization; a beneficiary-designation form; billing authorizations; a bed-hold policy; and a representative payee form.

. The plurality Court in Noland also distinguished that case from Briarcliff on the additional ground that the personal representatives in Briarcliff were also signatories to the arbitration agreement, whereas the personal representative in Noland was not a signatory to the arbitration agreement. The fact that Betty signed the arbitration agreement on behalf of Johnathan and then subsequently brought the wrongful-death claim as Johnathan’s personal representative forms the basis of Canterbury’s argument that Betty is bound to the agreement. This issue will be discussed in more detail infra.

. The age of majority to contract in Alabama is 19 years old. See Stinson v. Larson, 893 So.2d 462 (Ala.Civ.App.2004).

5. The admission agreement defined "Responsible Party” as the resident’s "legal guardian, if one has been appointed, or your Attomey-in-Fact, if you have executed a power of attorney, or some other individual or family member who agrees to assist the Facility in providing for your healthcare and maintenance.” The admission agreement contained a section entitled "Responsible Parly” in which the individual signing the agreement as the "Responsible Party” was to indicate his or her relationship to the resident. The admission agreement provided the signatory several relationship options from which to choose, including "spouse”; "relative”; "legal guardian”; "attorney-in-fact”; "friend or interested person”; and "other.” The - "Responsible Party” was to check each option that was applicable to describe the relationship status of the resident and "Responsible Party.” Betty indicated her relationship status to Johna- . than by checking.only the "relative” option and signed the admission agreement on behalf of Johnathan as the “Responsible Party.”

. It is undisputed that Johnathan was an adult incapacitated person. The Alabama Uniform Guardianship and Protective Proceedings Act, § 26-2A-1 et seq., Ala.Code 1975, provides options for the care and financial needs of an adult incapacitated person. Section 26-2A-102(e), Ala.Code 1975, provides:
"The custodial parent or parents or an adult custodial sibling of an adult child who is incapacitated by reason of ari intellectual disability, may file, in lieu of a petition, a written request [to the probate court] to be appointed guardian of his or her adult child or his or her adult sibling in order to continue performing custodial and other parental responsibilities or family responsibilities, or both responsibilities, for the child after the child has passed his or her minority.”
Section 26-2A-136(b)(3), Ala.Code 1975, regarding conservatorships and other protective orders also provides:
"After hearing and upon determining that a basis for an appointment or other protective order exists with respect to a person for reasons other than minority, the court, for the benefit of the person ... has all the powers over the estate and business affairs which the person could exercise if present and not under disability.... [T]hese powers include ... power ... to enter into contracts.”

. This misinterpretation notwithstanding this Court is not bound by the decisions of the Court of Civil Appeals. See generally § 12-3-16, Ala.Code 1975.