MAIN, Justice.
Kindred Nursing Centers' East, LLC, d/b/a 0791-Kindred Transitional Care and Rehabilitation-Whitesburg Gardens (“Whitesburg Gardens”), which owns and operates a long-term: care and rehabilitation facility, is a defendant in: an action filed by Lorene S. Jones that is pending in the Madison Circuit Court. ■ Whitesburg Gardens appeals from an order denying its motion to compel arbitration of Jones’s claims. We reverse and remand.
I. Facts and Procedural History
On January 21, 2013, Jones’s daughter, Yvonne Barbour, signed the forms on Jones’s behalf that were required by Whitesburg Gardens for Jones’s admission to the facility. Barbour signed the admission forms in the capacities of Jones’s resident representative, Jones’s legal representative, and Jones’s daughter. Barbour testified by affidavit that Jones was under the influence of strong pain medication when Barbour signed the various admission forms on her mother’s behalf. Jones was admitted to Whitesburg Gardens’ facility in Huntsville on January 23, 2013, following knee-replacement surgery. Jones was discharged from the facility on January 29, 2013, and was transferred to another facility.
The admission agreement Barbour signed contained the following definitions:
“a) ‘Center’ refers to the above-referenced nursing facility and the location at which the Resident will reside.
“b) ‘Resident’ refers collectively to the individual to be admitted to the Center and, where applicable, the Responsible Party and/or the Resident Representative.
“c) ‘Responsible Party[1] refers to an individual who has legal access to the Resident’s income and resources. This legal access can be proven by a docu *1148 ment such as a General Power of Attorney, a Durable Power of Attorney, or a court document that appoints the individual as a Guardian or a Conservator of the Estate. In contrast, a legal representative for healthcare is an individual who has legal authority to act on behalf of the Resident with regard to healthcare decisions. This legal authority can be proven by a document such as a Healthcare Power of Attorney, a Healthcare Proxy, a Durable Healthcare Power of Attorney, or a court document that appoints the individual as a Guardian or a Conservator of the Person. In short, while á legal representative for healthcare can make healthcare decisions for the Resident, a legal representative for healthcare is not a Responsible Party as defined in this Agreement unless that representative also has legal access to the Resident’s income and resources.
“d) ‘Resident Representative’ refers to an individual who does not necessarily have legal authority, as defined above, to act on behalf of the Resident; but, who has been selected by the Resident, Resident’s family or who has offered to assist the Resident and/or Resident’s family to act on behalf of the resident to the extent permitted by applicable state and federal laws.”
The admission agreement described the care and services to be provided to Jones at the facility, her rights as a resident, and her financial responsibilities. The admission agreement Contained alternative signature lines for “Resident,” “Responsible Party,”- or “Resident -Representative.” Barbour signed the admission agreement above the line on which was printed the phrase “Resident Representative” and checked a box indicating her relationship to Jones as being that of daughter. .
Barbour also signed a form entitled “Alternative Dispute Resolution Agreement (Optional)” (“the ADR agreement”). The ADR agreement provides, in pertinent part, as follows:
“This AGREEMENT (‘Agreement’) is made and entered into by and between 0791-Kindred Transitional Care and Rehabilitation-Whitesburg Gardens (the ‘Facility’), and Lorene S. Jones, an individual (the ‘Resident’).

“RECITALS:

“WHEREAS, the Facility operates a nursing home known as Kindred Transitional Care and Rehabilitation-Whites-burg Gardens, located in Huntsville, Alabama (the ‘Nursing Home’).
“WHEREAS, the Resident has applied ’ for admission to the Nursing Home; and
“WHEREAS, the Responsible Party is the Resident’s legal guardian, if one has been appointed, or the Resident’s attorney-in-fact, if the Resident has executed a durable power of attorney, or some other individual or family member who has agreed to assist the Facility in providing long term care services to the Resident; and
“NOW, THEREFORE, in consideration of the mutual benefits of the speedy, impartial, and cost-effective dispute resolution process agreed to by all parties pursuant to this Agreement, and the mutual covenants and promises herein contained, the receipt and adequacy of which are acknowledged by each party, the parties agree as follows:
“I. THE DISPUTE RESOLUTION PROCESS
“A. This Agreement creates a dispute resolution process (the ‘Process’) which shall govern the resolution of any and all claims or disputes that would constitute a cause of action in a court of law that the Facility may have now or in the future against the Resident, or that *1149 the Resident, the Responsible Party, or the Resident’s estate, successors, assigns, heirs, personal representatives, executors, and administrators may have now or in the future against the Facility, any parent or subsidiary of the Facility, any company affiliated with the Facility, or any of the Facility’s officers, directors, managers, employees, or agents acting in such capacity, including the medical director in his capacity as medical director, or that any other person may have arising out of or relating in any way to the Resident’s stay at the Facility (hereinafter referred to as ‘Disputes’). The Disputes whose resolution are governed by the Process shall include, but not be limited to, claims for breach of contract or promise (express or implied); tort claims; and claims for violation of any federal, state, local, or other governmental law, statute, regulation, common law, or ordinance. Notwithstanding the foregoing, the Process shall not govern (i) any grievance proceeding brought either formally or informally under the Facility’s grievance policy or with an appropriate state or federal agency, (ii) any appeal proceeding with the appropriate state or federal entity regarding an involuntary transfer or discharge, (iii) any complaint proceeding with the appropriate state or federal agency concerning the Facility’s compliance with applicable regulations governing care, Facility services, or residents’ rights, (iv) any complaint proceeding with the appropriate state or federal agency concerning resident abuse, neglect, misappropriation of resident property, or non-compliance with advance directive requirements. The parties to this Agreement understand that the Dispute Resolution Process contains provisions for both mediation and binding arbitration. If the parties are unable to resolve a Dispute informally, or through mediation, the Dispute shall proceed to binding arbitration. Binding arbitration means that the. parties are waiving their right to a trialj including their right to a jury trial and their right to trial by a Judge.
“B. It is the intention of the parties to this Agreement that it shall inure to the benefit of and bind the parties, their successors and assigns, agents, employees and ’servants of the Facility, and all persons whose claim is derived through or on behalf of the Resident, including any parent, spouse, child,'guardian, executor, administrator, legal representative, or heir of the Resident. The term ‘Resident’ includes the resident, his or her Guardian or Attorney in Fact per a Durable Power of Attorney, or any person whose claim is derived through or on behalf of the resident.
[[Image here]]
“D. The ‘Claimant’ may be the Facility, the Responsible Party, or the Resident, depending on who files the Request for [Alternative Dispute Resolution]. The other party or parties against whom the Request is filed will be the ‘Respondent(s).’ The Request shall made in writing and may be submitted to DJS [Administrative Services, Inc.] (the ‘Administrator’) by regular mail, certified mail, or overnight delivery. The Request must identify the issues in dispute, the amount(s) in dispute, any special qualifications of the neutral desired, and the Respondent(s).
“E. All claims based in whole or in part on the same incident, transaction, or related course of care or services provided by the Facility to the Resident, shall be mediated or arbitrated in one proceeding. A claim shall be waived and forever barred if it arose prior to the Request for [Alternative Dispute *1150 Resolution] and is not presented in the arbitration hearing.
“....
“H. Arbitration Hearing. Arbitration is a procedure in which the parties submit a Dispute to one or more mutually selected, impartial persons for a final and binding decision. The parties expressly agree to settle all Disputes by binding arbitration rather than by a judge, jury, or administrative agency; provided, however, that nothing in this Agreement shall prevent Resident or any other person from reporting, and an administrative agency from investigating, alleged violations of law. Arbitration is a complete substitute for a trial by a judge or a jury. Only Disputes that would constitute a legally cognizable cause of action in a court of law may be arbitrated. The arbitrator(s) shall be impartial and independent and shall apply the substantive law (and the law of remedies, if applicable) of Alabama, or federal law, or both, as may be applicable to the Dispute, except as otherwise stated in this Agreement.
[[Image here]]
“K. The Resident, or his or her legal guardian, or authorized Power of Attorney understand that other local nursing home’s [sic] agreements may not contain an arbitration provision. The parties agree that the cost-effectiveness, time-efficiency and public policy reasons stated above are proper consideration for the acceptance of the Agreement.
[[Image here]]
“HI. GENERAL
“A. Interstate Commerce. The parties acknowledge that Facility regularly engages in transactions involving interstate commerce and that the services provided by Facility to Resident involve such interstate commerce. The parties expressly agree that, except as described in paragraph G [not applicable to this case], this Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. § let seq,
“B. Revocation, This Agreement shall remain in effect until such time as all parties mutually agree in writing to terminate this Agreement. This Agreement- shall survive the death of the Resident or the Resident’s departure from the Nursing Home and shall apply to all Disputes whether they arise or are asserted before, during, or after the Resident’s stay at the Nursing Home. This Agreement can only be revoked or modified by a writing or writings signed by all parties specifically stating an intent to revoke or modify this Agreement.

“....

“IV. RESIDENT’S UNDERSTANDING OF AGREEMENT
“The Resident understands that (A) he/she has the right to seek legal counsel concerning this Agreement, (B) the execution of this Agreement is not a precondition to the furnishing of services to the Resident by the Facility, and (C) this Arbitration Agreement may be revoked by written notice to the Facility from the Resident within thirty (30) days of signature. If not revoked within thirty (30) days, this Agreement shall remain in effect for all care and services subsequently rendered at the Facility, even if such care and services are following the Resident’s discharge and readmission to the Facility. The Resident, or his or her designated legal representative, also had the opportunity to consult with a Facility representative regarding such explanations or clarification.”
(Boldface type and capitalization in original.) The ADR agreement lists Jones as *1151 the “Resident” and contains alternative signature lines for “Resident or Legal Representative” or “Yvonne Barbour, Daughter.” Barbour signed her name to the ADR agreement on the signature line provided for the “Resident or Legal Representative.” The ADR agreement concluded- under the signature lines with the following statement:
“If signed by a Legal Representative, the representative certifies that the Facility may reasonably rely upon the validity and authority of the- representative’s signature based upon actual, implied or apparent authority to execute this Agreement as granted by the resident.”
On January 23, 2015, Jones sued Whitesburg Gardens and its administrator, Shirley Warren. Jones later voluntarily dismissed Warren as a defendant. In the complaint, Jones alleges that while she was a resident at the facility employees there injured her when they dropped her while moving her. Jones also enumerated multiple allegations of allegedly substandard care she received while a resident at the facility. Jones asserted claim's of negligence, wantonness, breach of contract, and fraudulent concealment. ■
Whitesburg Gardens moved to compel arbitration of Jones’s claims. In support of the motion, it submitted the admission agreement and the ADR agreement, as well as an affidavit from Kimberly Dunn, a liability-claims paralegal with “Kindred Healthcare,” who stated:
‘Whitesburg Gardens was licensed for 159 beds. Some of the residents came to the facility from outside the state of Alabama. The facility purchased a majority of its equipment, medications, and supplies from companies located outside Alabama. Many of the residents were Medicare or Medicaid patients. Medicare paid for care provided to Lorene Jones.”
Jones opposed the motion to compel arbitration. Barbour submitted an affidavit in the trial court in opposition to the motion to compel in which she stated:
“My name is Yvonne Barbour. I am over the age of nineteen and have personal knowledge of the matters set forth herein. On or before January 21, 2013 my mother had been admitted to and was a patient of Crestwood Hospital following a total knee replacement surgery. Following the surgery my mother was not ambulatory and her doctors and staff at Crestwood Hospital recommended that upon her discharge from Crestwood Hospital she would need 24 hour nursing and medical care due to self-care deficits. The staff at Crest-wood Hospital provided us with a list of potential nursing homes. We wanted mother to be admitted to HealthSouth[;] however we were notified by the social worker at Crestwood Hospital that she did not qualify because she needed too much care. Consequently, we decided on Whitesburg Gardens and the employees at Crestwood Hospital then made arrangements for my mother to be transferred there. The social worker at Crestwood told me to go down to Whitesburg Gardens in order -to sign admission documents so that my mother could be transferred. Upon arrival at Whitesburg Gardens, I was greeted by an employee who presented me with admission documents, apparently including an arbitration agreement. At that time, I did not have a power of attorney over my mother, nor did I have any legal basis for signing my mother’s name, or obligating her contractually. My mother was mentally incompetent and physically incapacitated at the time. - My mother did not have the mental capacity to give her consent to an arbitration *1152 agreement at that time. She was under the influence of heavy pain medication. The admission paperwork was never presented to my mother. I signed my own name to this agreement, and I signed in my own personal capacity. My mother never was given an opportunity to sign the admission documents, nor did she sign them. My mother never gave me any instructions to sign on her behalf. I signed in my own individual capacity, not pursuant to any instruction or other legal authority. My mother was not present when the admission documents and the arbitration agreement were presented to me. I never represented to anyone at Whites-burg Gardens that I had a power of attorney or that I had been authorized to sign on my mother’s behalf. They simply presented me with documents and told me where to sign. I have reviewed the arbitration agreement and the line for signature that they indicated that I should sign on indicates that I signed as legal representative. I was not then, nor have I ever been my mother’s legal representative. My mother was not present, nor was she even aware that I was signing any documents on her behalf.”
Whitesburg Gardens then submitted medical records from Jones’s stay at the facility as additional support for its motion to compel arbitration. On Jones’s admission evaluation on January 23, she’ was described as “alert to person, place, and time,” calm, able to communicate with and to understand others, and without visible signs of distress. When asked about her pain level during the five days leading up to her admission, Jones stated that she had been in pain daily since her surgery and described her pain level on a scale of 0-10 as 4. There is no indication that Jones suffered from any cognitive defects- or from dementia. The progress notes during Jones’s stay at the facility indicate that she denied pain early in the day, but received the pain medication Lorcet during or after physical therapy on January 24 and 25. According to the medical records, the two doses of Lorcet were the only pain medication dispensed to Jones during her stay. The pain-assessment form completed after Jones’s discharge on January 29 noted that she had had occasional pain during the preceding five days, that her pain did not make it difficult for her to sleep at night, and that her pain did not cause her to limit her daily activities. Jones again rated her pain level as 4 on a scale of 0-10. Staff members did not observe any nonverbal indicators of pain. On January 28, Jones’s medical records noted that Barbour requested that Jones be transferred to another facility; on January 29, the records indicate that Jones was discharged to another facility that was closer to her family.
The trial court denied Whitesburg Gardens’ motion to compel arbitration. Whitesburg Gardens appealed.
II. Standard of Review
“ ‘This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala.2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party'seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce. Id. “[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” Jim Burke Automotive, Inc. v. *1153 Beavers, 674 So.2d 1260, 1266 n. 1 (Ala.1995) (opinion on application for rehearing).’ ”
Elizabeth Homes, L.L.C. v. Gantt, 882 So.2d 313, 315 (Ala.2003) (quoting Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000)).
III. Analysis
The dispositive issue on appeal is whether Whitesburg Gardens has satisfied its burden of proving the existence of a contract calling for arbitration. As a well recognized general rule, “a nonsignatory to an arbitration agreement cannot be forced to arbitrate her claims.” Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001). There are, of course, exceptions to this general rule. As Justice Stuart, writing for the Court in SSC Montgomery Cedar Crest Operating Co. v. Bolding, 130 So.3d 1194, 1196 (Ala.2013), stated: “[T]his Court has created a distinct body of caselaw considering specifically the issue how and when arbitration agreements executed by the owners and operators of nursing homes and their residents and/or their residents’ family members should be enforced.” See also Diversicare Leasing Corp. v. Hubbard, 189 So.3d 24 (Ala.2015); Tennessee Health Mgmt., Inc. v. Johnson, 49 So.3d 175 (Ala.2010); Carraway v. Beverly Enters. Alabama, Inc., 978 So.2d 27 (Ala.2007); Noland Health Servs., Inc. v. Wright, 971 So.2d 681 (Ala.2007); Briarcliff Nursing Home, Inc. v. Turcotte, 894 So.2d 661 (Ala.2004); and Owens v. Coosa Valley Health Care, Inc., 890 So.2d 983 (Ala.2004).
The critical distinguishing factor in this body of caselaw is whether the nursing-home resident on whose behalf 'the arbitration agreement was signed was mentally competent. As Justice Bolin, writing for the ' Court, noted in Hubbard: “Justice Stuart aptly explained [in Bolding ] the distinguishing principle between arbitration agreements signed on behalf of competent nursing-home residents and arbitration agreements signed on behalf' of mentally incompetent nursing-home residents, making clear this Court’s treatment of the two.” 189 So.3d at 34. Bolding stated:
“The only evidence before the Court in this case indicates that Means [the resident] was mentally incompetent when he was, admitted to [the nursing home] and the DRA [dispute-resolution agreement] was executed; indeed, [the nursing home] does not even argue that he was competent at any relevant time....
“Children and the mentally incompetent have, traditionally been treated differently under the law than the standard competent adult. See, e.g., Ex parte E.R.G., 73 So.3d 634, 678 (Ala.2011) (Main, J., dissenting) (‘The state necessarily injects itself into the affairs of children and the mentally incompetent when they are in need of protection because their-developmental differences and their environmental restraints render them more vulnerable than competent adults.’). And, while we have held that competent residents of nursing homes may be bound by arbitration agreements executed by their representatives, see, e.g., Carraway [v. Beverly Enters. Alabama, Inc.], 978 So.2d [27] at 30-31 [(Ala.2007)], and [Tennessee Health Mgmt., Inc. v.] Johnson, 49 So.3d [175] at 176 [(Ala.2010)], our cases also indicate that incompetent residents are not so bound. In Noland Health Services [, Inc. v. Wright, 971 So.2d 681 (Ala.2007)], we considered whether the administrator of Dorothy Willis’s estate was bound to arbitrate personal-injury and wrongful-death claims stemming from Dorothy’s treatment at a nursing home pursuant to an arbitration provision in a contract exe *1154 cuted by Dorothy’s daughter-in-law, Vicky Willis, when Dorothy was admitted to the. nursing home. 971 So.2d at 683. A plurality of the Court agreed with the trial court’s finding that Dorothy was incompetent when the contract was signed and that Vicky’s signature as the 'responsible party’ or next friend on that contract ‘was ineffective to bind Dorothy or her personal representative to the agreement.’ 971 So.2d at 686....
“Of course, Noland Health Services was a plurality opinion, and its prece-dential value is accordingly limited. Ex parte Achenbach, 783 So.2d 4, 7 (Ala.2000). However, this Court subsequently recognized the principle for which Noland Health Services is now cited in Johnson. In Johnson, Tennessee Health Management (‘THM’) appealed the denial of its motion to enforce an arbitration agreement against Carol Rousseau Johnson, who was prosecuting personal-injury and wrongful-death claims against THM in her capacity as the personal representative of the estate of Dolores Rousseau, who allegedly was injured while a resident of a nursing home operated by THM. 49 So.3d at 176. When Dolores was admitted to that nursing home, her daughter Barbara Rousseau had signed an arbitration agreement with THM, but ‘[t]here is no evidence indicating that Dolores ... was mentally incompetent when she was admitted ....’ 49 So.3d at 176-77. Citing Noland. Health Services, Carol subsequently argued to this Court that Dolores was not bound by the arbitration agreement because she had not signed it. 49 So.3d at 180. This Court rejected her argument, distinguishing Noland Health Services as follows:
“ ‘Carol relies upon Noland Health Services, Inc. v. Wright, 971 So.2d 681 (Ala.2007). In Noland,, a plurality of this Court held that a daughter-in-law’s signature as the responsible party on a nursing-home arbitration agreement was ineffective to bind the resident to the agreement. Noland is distinguishable from this case, however, because the nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf and because the daughter-in-law did' not sign any document in the capacity of her mother-in-law’s legal representative.’
“Johnson, 49 So.3d at 180-81. We thereafter held that the arbitration agreement executed by Barbara did bind Dolores and was therefore enforceable against Carol, thus recognizing the distinction between arbitration agreements signed on behalf of nursing-home residents who are incompetent and those signed on behalf of nursing-home residents who are competent. 49 So.3d at 181.
[[Image here]]
“[The nursing home] argues in the alternative that the doctrine of apparent authority should nevertheless bind Means [the resident], and by extension Bolding [Means’s daughter, who held a power of attorney], to the [arbitration agreement signed by Pleasant, another of Means’s daughters]. ' In Carraway, we applied the doctrine of apparent authority to hold that Shirley Carraway, a nursing-honae resident, was bound by an arbitration agreement signed by her brother Richard Carraway:
“ ‘Just as Richard signed all the other documents relating to Shirley’s admission into the nursing home on Shirley’s behalf, Richard signed the arbitration agreement on Shirley’s behalf expressly as an “authorized representative.” Apparent authority “is im.plied where the principal passively permits the agent to appear to a third *1155 person to have the authority to act on [her] behalf.”, Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc., 426 So.2d 859, 861 (Ala.Civ.App.1983). “It is not essential that the right of control be exercised so long as that right actually exists.” Wood Chevrolet Co. v. Bank of the Southeast, 352 So.2d 1350, 1352 (Ala.1977). There, is no evidence indicating that Shirley had any objection to Richard’s acting on her behalf in admitting Shirley to the nursing home. On the contrary, the evidence suggests that Shirley approved of her brother’s acting on her behalf. A few weeks into Shirley’s residency at the nursing home, she executed a power of attorney, giving Richard further authority to act on her behalf.’
“978 So.2d at 30-31. We likewise applied the doctrine of apparent authority in Johnson, stating that Dolores ‘passively permitted Barbara to appear to THM to have the authority to act on her behalf, and Barbara’s apparent authority is, therefore, implied.’ 49 So.3d at 180. However, in both Carraioay and Johnson the nursing-home resident was competent and effectively acquiesced to and/or ratified the decisions made by their respective representative, thus making the application of the apparent-authority doctrine appropriate.
“In contrast, the only evidence in the record in this case indicates that Means is incompetent and thus unable to empower an agent, whether passively or through affirmative acts. See Johnson, 49 So.3d at 180-81 (‘[T]he nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf,Thus, at best Pleasant may have purported to be Means’s legal representative, but that is an insufficient basis upon which to apply the doctrine of apparent authority. Northington v. Dairyland Ins. Co., 445 So.2d 283, 286 (Ala.1984) (‘[I]n order for a principal to be held liable under the doctrine of apparent authority and es-toppel,, the principal must have engaged in some conduct which led a third party to believe that the agent had authority to act for the principal.’ (emphasis added)) ....
“In conclusion, we hold that Means was not bound by the DRA executed by Pleasant; therefore, Bolding was not bound. However, we emphasize that this conclusion is not reached because Means did not personally execute the DRA. Rather, it is because all the evidence in the record indicates that Means is incompetent. Thus, while Bolding, as the holder of a durable power of attorney granted by Means, may have been able to bind him to an arbitration agreement, Pleasant, as merely a family member or next friend, could not.”
Bolding, 130 So.3d at 1196-99 (final emphasis added).
. Likewise, in Hubbard, the Court held that a mentally incompetent young adult was not bound by an arbitration. agreement with a nursing home at which he was a resident signed by his mother on his behalf.
“Here, it is undisputed that at the time Johnathan was admitted to Canterbury he was 21 years old and mentally incompetent. All the evidence indicates that Johnathan had the mental capacity of ‘an infant’ or a ‘toddler’ and that he was totally dependant upon others for his. care.... Because Johnathan was mentally incompetent at the time Betty [his mother] executed the arbitration agreement, he cannot be bound to the agreement since he was incapable of authorizing or empowering Betty to act on *1156 his behalf. Bolding, supra; Noland, supra; and Johnson, supra.”
192 So.3d at 37.
Whitesburg Gardens argues that the ADR agreement is enforceable as to Jones because Barbour had the apparent authority to sign the ADR agreement and the other admission documents on her mother’s behalf. Jones argues that she cannot be bound by the ADR agreement because she was not mentally competent when Barbour signed it. In her affidavit, Barbour avers that Jones was mentally incompetent at the time Barbour signed the admission forms because Jones had been given “heavy pain medication” in the hospital following her knee-replacement surgery. In response to Jones’s argument, Whitesburg Gardens argues that, according to its internal medical records, pain medication should have had no bearing on the issue of Jones’s mental competence during her stay at the facility. Jones insists that the medical records are not relevant to the question whether she was mentally incompetent when Barbour executed the ADR agreement. Both parties also argue that the other had the burden of proving whether Jones was mentally competent.
In the cases in which this Court has held arbitration agreements nonbinding on mentally incompetent residents of nursing homes, those residents were substantially mentally impaired. In Hubbard, the resident suffered from lifelong cerebral palsy and had the mental capacity of an infant or a toddler. In Bolding, the resident had been hospitalized after suffering stroke and heart-attack symptoms; the nursing home in that case did not contest his mental incapacity when he was admitted. In Noland, the resident' suffered from dementia related to Alzheimer’s disease. In this case, even if Jones’s pain medication in the hospital caused some level of mental incompetence, there is simply no evidence indicating that any such mental incompetence continued during her stay at the facility or that Jones’s alleged mental incompetence rose to the level of the mental incompetence of the nursing-home residents in Hubbard, Bolding, or Noland. We therefore need not decide in this case which party has the burden of proving mental competence.
Jones also argues that Barbour did not have any legal basis on which to sign Barbour’s name to the admission documents and that she did not authorize Barbour to sign those documents on her behalf. Jones also argues that Whitesburg Gardens, did not submit any evidence indicating that, even if the effect of her pain medication had diminished, she became aware of the ADR agreement and ratified it. We disagree. Jones passively ratified the ADR agreement; the circumstances of her ratification are substantially similar to those in Johnson, which is instructive here:
“The facts in this case concerning the execution of the ADR agreement are similar to those [in Carraway ]. Barbara signed all the documents admitting Dolores to Millennium, including the ADR agreement, in various representative capacities. The ADR agreement specifically defined the party to be bound by the agreement as Dolores or ‘any representative of that individual.’ Furthermore, it states that the parties agreed that the individuals who signed the agreement have the legal authority to bind their respective parties. Because Dolores enjoyed the ease of checking into Millennium without the requirement that she sign anything, under circumstances in which no reasonable person could consider the admission possible without the intervention of an agent to act on Dolores’s behalf, she *1157 thereby passively permitted Barbara to appear to THM to have the authority to act on her behalf, and Barbara’s apparent authority is, therefore, implied. See Carraway, 978 So.2d at 30 (‘Apparent authority “is implied where the principal passively permits the agent to appear to a third person to have the authority to act on [her] behalf.” ’ (quoting Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc., 426 So.2d 859, 861 (Ala.Civ.App.1983))).
“Carol relies upon the fact that Dolores did not instruct Barbara to sign the admission documents on her behalf. Notwithstanding the absence of evidence indicating that Dolores instructed Barbara to sign the admission documents on her behalf, there is no evidence indicating that upon entering Millennium or any time after her admission Dolores ever signed any document obligating herself to pay for the services, that she ever objected to Barbara’s having signed the admission documents, or that she understood that Millennium was treating her without charge, dispensing with the necessity for an agreement. Instead, Dolores remained at Millennium for six days, accepting the benefits of the services rendered without objection or question. As was the case in Carraivay, ‘[t]here is no evidence indicating that [Dolores] had any objection to [Bar-barais acting on her behalf in admitting [Dolores] to the nursing home.’ 978 So.2d at 31.”
Johnson, 49 So.3d at 180.
We conclude that Jones was mentally competent when she was admitted to and during her stay at the facility. Therefore, because this Court’s precedent holds that competent residents of nursing homes can be bound by arbitration agreements executed by their representatives, we hold that Jones is so bound. Moreover, in view of the evidence indicating that Jones passively permitted Barbour to act on her behalf in signing the admission forms and the lack of evidence indicating that Jones ever objected to Barbour’s signing those forms, we hold that Barbour had the apparent authority to bind Jones at the time Barbour signed the admission documents. Under these circumstances, Whitesburg Gardens proved the existence of a valid contract calling for arbitration. The trial court erred in denying the motion to compel arbitration. Because we reverse on that basis, we need not address the other arguments advanced by the parties.
IV. Conclusion
Whitesburg Gardens has satisfied its burden of showing the existence of a valid arbitration agreement. We conclude that the trial court erred in denying Whites-burg Gardens’ motion to compel arbitration in accordance with the ADR agreement. We therefore reverse the trial court’s order denying the motion to compel arbitration and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
STUART, BOLIN, PARKER, SHAW, WISE, and BRYAN, JJ., concur.
MOORE, C.J., and MURDOCK, J., dissent.

. It appears that GGNSC did not attempt to rely on Johnson, possibly because Carraway was more analogous to Licata than was Johnson. Nevertheless, because Johnson was based on Carraway, if the Licata court disagreed with Carraway, then it certainly would have disagreed with Johnson as well.